# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,

vs                                 **Case No: 05-81027**
                                        **Honorable Victoria A. Roberts**

ALONZO BATES,

      Defendant.

_____/

## OPINION AND ORDER

## I.    INTRODUCTION

Defendant Alonzo Bates was convicted on Counts 5 - 8 -- theft from a program receiving federal funds (18 U.S.C. §§666, 2) and Count 10 -- bank fraud (18 U.S.C. §1344). Defendant also pled guilty to Counts 11 - 14 -- failure to file an income tax return (26 U.S.C. §7203), without a Rule 11 Plea Agreement. The Government dismissed Counts 1 - 4 -- mail fraud (18 U.S.C. §1341) -- before trial, and jurors could not reach a verdict on Count 9 -- interference with commerce by extortion (18 U.S.C. §1951).

The probation department calculates Defendant's sentencing Guideline range to be 33 to 41 months, based on a criminal history category of I and an offense level of 20. The probation department's calculation includes two enhancements for Counts 5 - 8. Two points were added for Defendant's role as an organizer/leader in the offense, pursuant to U.S.S.G. §3B1.1(c), and two points were added for abuse of a position of

1

public trust, pursuant to U.S.S.G. §3B1.3.  The probation department calculates the loss amount for each Count as follows:

| | | |
|---|---|---|
| Count 5 (Verenda Arnold) | -- | $42,818.74 |
| Counts 6/10 (Jollan Johnson) | -- | 10,000.00 |
| Count 7 (Britni Barber) | -- | 31,680.00 |
| Count 8 (Melvin Cartwright) | -- | 7,750.00 |
| TOTAL: | | $ 92,248.74 |

PSIR at ¶35.

Defendant objects to the two-point enhancement for being an organizer/leader, and to the probation department's inclusion of facts in the Presentence Investigation Report ("PSIR") relative to Count 9.  Defendant also contends that the loss amounts for Counts 5 through 8 are overstated, and he asks the Court to consider his multiple health conditions in sentencing.

## II.    APPLICABLE LAW AND ANALYSIS

### a.    COUNT 9

Defendant asks the Court to strike paragraphs 28 through 30 from the PSIR. Those paragraphs summarize the Government's allegations in support of the extortion claim in Count 9 of the Indictment--that he accepted a free roof from Filmore Construction in exchange for the promise of official acts.  However, the jury was unable to reach a verdict on Count 9, and Defendant contends that the summary in the PSIR does not reflect contrary facts established during cross examination of David Helfman (of Filmore Construction).  (Defendant does not outline the facts to which he refers.)

The Government asserts that the allegations in Count 9 are relevant conduct the Court may consider under U.S.S.G. §1B1.3 to decide the appropriate sentence.

Defendant acknowledges that the Court may consider the alleged extortion evidence if it finds that the charge was proven by a preponderance. *See United States v Milton*, 27 F.3d 203, 209 (6th Cir. 1994). Indeed, at sentencing the Sixth Circuit even permits district courts to consider relevant conduct for which the defendant has been acquitted. *Id*; *United States v Moreno*, 933 F.2d 362, 374 (6th Cir. 1991). The rationale is that "in order to convict at trial the government bears the burden of proving the elements of the offense beyond a reasonable doubt. However the burden of proof at sentencing is the lesser preponderance of evidence standard." *Moreno*, 933 F.2d at 374.

Defendant, however, contends that the Government failed to meet even the preponderance standard because: 1) Mr. Helfman and Defendant had a long-standing relationship during which Mr. Helfman provided financial support for Defendant's campaign as well as the campaigns of Defendant's family and associates; 2) Defendant never asked that the roof be installed for free, nor did Defendant insinuate that he would use his influence as a city council member against Mr. Helfman if Helfman did not provide the roof for free; 3) Fillmore Construction never sent Defendant a bill for the roof; and 4) although Mr. Helfman stated that he believes his conduct regarding the roof constituted a crime, he has not pled guilty to any crime or entered into a Rule 11 agreement.

There was no direct evidence that Defendant accepted the roof without charge, knowing that Helfman expected an official act from Defendant in return. Helfman's

testimony only established that he thought he could curry favor by providing the roof for free. There was no evidence that Defendant ever asked that the roof be provided for free or suggested that doing so was necessary to avoid retaliation. There also was no evidence Defendant actually performed any acts on Helfman's behalf. However, a §1951 violation occurs when a public official receives something to which he was not entitled with knowledge that it was given in return for official acts, even if the *quid pro quo* is not fulfilled. *See Evans v United States*, 504 U.S. 255, 267 (1992). And, the *quid pro quo* does not have to be expressly articulated:

> The official and the payor need not state the *quid pro quo* in express terms, for otherwise the law's effect could be frustrated by knowing winks and nods. The inducement from the official is criminal if it is express or if it is implied from his words and actions, so long as he intends it to be so and the payor so interprets it.
>
> The criminal law in the usual course concerns itself with motives and consequences, not formalities. And the trier of fact is quite capable of deciding the intent with which words were spoken or actions taken as well as the reasonable construction given to them by the official and the payor.

*Id* at 274 (1992)(Kennedy, J., concurring). *See also United States v Blandford*, 33 F.3d 685, 696 (1994)(interpreting *Evans*).

The Court finds there is sufficient circumstantial evidence to establish by a preponderance that Defendant knew the roof was provided with the expectation that he would reciprocate in an official way. Defendant admits that Helfman was a long-standing campaign contributor. Defendant was aware that Helfman was a contractor with interests that could come before him in his capacity as a city councilman. In fact, Defendant once used his authority to assist Helfman in a dispute with the City of Detroit

over a contract by arranging a meeting with the city law department (although the City ultimately refused to settle the dispute). PSIR at ¶28. And, Defendant repeatedly solicited Helfman to perform a number of repairs on his home, including electrical work, repairs to his ceiling and floor, and installation of a furnace, without paying for the services. PSIR at ¶30. (The Government says that Defendant has known Helfman for over 15 years, but only began to request free work after he became a City Councilman. However, the Government does not cite the basis for this assertion.)

Defendant correctly points out that there is no evidence that he explicitly asked that the roof be installed for free in exchange for assistance from Defendant in his official capacity. But, the Sixth Circuit has said that extortion under color of official right can be found even if an official does not "explicitly remind the victim that he is a public official, and that he has the power to make bad things happen to the victim if he does not accede to the official's explicit or implicit demand." *United States v Carmichael,* 232 F.3d 510, 520 (6th Cir. 2000). Here, Defendant was in a position to influence Helfman's business with the City of Detroit, he used that influence to assist Helfman in the past, and he solicited services from Helfman that the Court can reasonably presume he was aware were valued at thousands of dollars--$7,480 in this case--without paying for those services or questioning Filmore Construction's failure to bill him. PSIR at ¶30. These facts when considered in the aggregate suggest by a preponderance, that Defendant knew that the roof was given with the understanding that Helfman would receive favorable assistance from Defendant in his capacity as a City Councilman.

Defendant's request to strike paragraphs 28 through 30 from the PSIR and that the substance of those paragraphs not be considered as relevant conduct, is denied.

5

**b.    Leadership Enhancement**

U.S.S.G. §3B1.1(c) provides that a defendant's offense level should be increased by two if the defendant was "an organizer, leader, manager, or supervisor in any criminal activity."  The Government asserts that the enhancement is warranted because Defendant supervised Jollan Johnson, Britni Barber, Veranda Arnold and Melvin Cartwright and approved their false time records.

Defendant objects.  He argues that he did not act as a supervisor in the manner contemplated by §3B1.1(c).  Defendant further asserts that he did not recruit any of the so-called "ghost" employees to take a "ghost" position, and none of them claimed that he encouraged or ordered them not to work.  In fact, Defendant points out that Ms. Barber testified that she never told Defendant that she was doing little or no work.  And, Defendant says he never received a kickback or other payment from the employees.

Application Note 2 to §3B1.1(c) provides that a two-level enhancement is warranted if the defendant was a supervisor for at least one participant:

> To qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants. An upward departure may be warranted, however, in the case of a defendant who did not organize, lead, manage, or supervise another participant, but who nevertheless exercised management responsibility over the property, assets, or activities of a criminal organization.

The Sixth Circuit adopted the substance of Note 2.  *See United States v Gort-DiDonato*, 109 F.3d 318, 321 (6th Cir. 1997); *United States v Caseslorente*, 220 F.3d 727, 735 (6th Cir. 2000).

Defendant contends that, when construed in its proper context, Note 2 means

that Defendant must have been the supervisor in the crime itself.  However, he argues that there was no evidence that he instructed or supervised the "ghost" employees in the commission of the crime.

In deciding whether to apply a §3B1.1 enhancement, the Court must consider: "[T]he exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others."  U.S.S.G. §3B1.1, Application Note 4.  However, "[t]hese factors are only designed to provide guidance to the sentencing court, and there is no requirement that each factor be met."  *United States v Green*, 202 F.3d 869, 871 (6th Cir. 2000).  "The government bears the burden of demonstrating by a preponderance of the evidence that an enhancement is justified."  *Id*.

Defendant certainly acted in a supervisory capacity over Arnold, Johnson, Barber and Cartwright.  But, neither party cited nor did the Court uncover any cases where the enhancement was applied under circumstances similar to those involving Arnold, Barber and Cartwright.  As Defendant contends, most cases involve a clear criminal plan in which the defendant is directly involved in carrying out the crime and derives benefits, *i.e.*, a drug conspiracy, identity theft.  *See United States v Martinez*, 181 F.3d 794 (6th Cir. 1999)(drug conspiracy); *United States v Gort-DiDonato*, *supra* (wire fraud); *United States v Caseslorente*, *supra* (theft of government property--recyclables).  Here, Defendant did not orchestrate Arnold, Barber and Cartwright's crimes in the typical sense.  He used his authority to abuse the public trust by allowing friends and family to

receive salaries for little or no work.

Defendant's conduct with respect to Jollan Johnson, however, brings Defendant within the rule. Johnson's employment did not follow the same track as the others because Defendant was directly involved in setting up and continuing the scheme by falsely representing that Johnson was a college student on the service contract and approving Johnson's timesheets for 11 months, although Defendant was indisputably aware Johnson did not perform legislative duties for all or even most of the time for which he was paid as a legislative assistant. PSIR at ¶22. Defendant arguably has at least plausible deniability regarding the extent of his knowledge that Arnold, Barber and Cartwright were not performing all of their duties. But, there was no evidence at trial that he assigned Johnson enough legislative work that he could reasonably claim to have been unaware that Johnson did not work all of the hours for which he was paid.

Defendant derived benefits from the arrangement by using Johnson to perform lawn services and odd jobs at Defendant's personal properties. *Id.* He supervised Johnson in these activities and one could find by a preponderance that he did so in exchange for keeping Johnson on the city payroll. (Defendant claims that Johnson did chores to repay rent and utilities he owed because he lived in Defendant's rental property for free for almost one year. But, Johnson testified that he paid Defendant $200 per month for rent. Tr. Vol. 2, p. 145.). The Court may infer Johnson's complicity in the scheme from the fact that he initially lied to investigators (or the grand jury) about the type and amount of work he did in an effort to protect Defendant.

The Court notes that Defendant also accepted and cashed several payroll checks made payable to Johnson after Johnson relocated to Alabama. *Id* at 23.

8

However, the enhancement only applies when there are at least two culpable individuals involved in the scheme. *United States v Kotoch*, 954 F.2d 340, 342 (6th Cir. 1992); *United States v Lewis*, 68 F.3d 987, 990 (6th Cir. 1995). But, Johnson denied giving Defendant permission to cash the checks on his behalf or that he received any of the money. There was no evidence which contradicted Johnson's claim. Therefore, an enhancement would not be warranted based upon the checks Defendant cashed.

There is sufficient evidence for the Court to find by a preponderance that Defendant supervised Jollan Johnson in the scheme within the meaning of §3B1.1(c).

### c.    Loss Amounts

Defendant disputes the loss amounts calculated by the probation department for money wrongfully received by Verenda Arnold, Britni Barber, Melvin Cartwright, and Jollan Johnson. Defendant may be assessed the actual or intended loss amount, whichever is greater. U.S.S.G. §2B1.1, Application Note 3(A). The Court is only required to make a reasonable estimate of the loss based on available evidence and information. *Id* at Application Note 3(C).

### i.    Verenda Arnold

The probation department calculates that Ms. Arnold was overpaid by $42,818.74. Defendant contends that this figure is based on the Government's flawed method of comparing time sheets she submitted to St. John Hospital, where she also worked at the time, and to Defendant. Defendant contends that this is not a reasonable means of determining the hours Arnold worked because she and other employees testified that it was common practice to list any timeframe that corresponded with the

number of hours worked even if the employee actually worked at different times.

Defendant contends that the Government's alternate formula -- tallying the hours Arnold spent at precinct and breakfast meetings each month (17 per month) -- is also flawed because it does not credit her with all of the time actually spent on those activities, including preparation and clean up time before and after the breakfasts. Arnold and Zen Braswell (via affidavit) also assert that the alternate formula is flawed for the same reason. They both contend that Arnold worked at least 50% of the hours for which she was paid. In support of this claim, Defendant attaches a number of notes and flyers showing events she attended and/or were assigned. *See* Def. Exh. 2(E),(G). Although Braswell agreed with the Government's calculation when he testified before the grand jury, he said that he had not had an opportunity to review the notes and flyers Defendant presents in Exhibit 2. Also, Andrea Perry testified that she attended a number of events with Arnold, and that they sometimes worked together on the breakfasts.

The Government acknowledges that it relied upon the "overlapping hours" formula, but contends that it resulted in a generous estimate of the hours Arnold worked--949 hours. *See* Gov't Exh. C. The Government asserts that the evidence shows that she actually worked significantly fewer hours. For instance, although Arnold claims she attended a number of breakfasts and precinct meetings, Jai-Lee Dearing and Kimberly Wardford said they only saw her once or twice at breakfast events. Dearing said he never saw her at precinct meetings. Another employee, Patricia Stigler, said she never saw Arnold at the breakfasts.

In any event, the Government says that Arnold would be credited with

significantly less than 949 hours even if it presumed that she attended every precinct meeting and breakfast. With a 5 hour credit for one breakfast per month and a 12 hour credit for 12 precinct meetings per month, the Government says the most Arnold could have worked was 17 hours, which totals 544 hours over the 32 months she was employed with Defendant.

Lastly, the Government points out that Arnold agreed in her Rule 11 Plea Agreement that she was paid $42,825 for hours she did not work. Def. Exh. D. And, when she interviewed with Assistant United States Attorney R. Michael Bullotta and several agents, Arnold admitted that she could not account for 69.5 of the 80 hours she was paid each month.

Notwithstanding the admissions in her Plea Agreement and statements to Bullotta, Arnold testified that she attended a number of events in addition to breakfasts and precinct meetings, which are documented to some extent in Defendant's Exhibit 2. Defendant further contends that Dearing's testimony does not contradict Arnold's claims because he left Defendant's office to run for public office before Arnold began regularly attending breakfasts and precinct meetings. Also, Arnold said that she often cooked for the breakfasts off-site even if she did not attend.

The Court finds that the Government's calculation is a reasonable estimate of the amount Arnold was overpaid. Arnold was paid for 2,662 hours at $25 per hour between May 2002 and December 2004. *See* Def. Exh. C. 1,712.75 of those hours overlapped with times she was working at St. John's hospital. *Id.* Therefore, the Government only credited Arnold with the non-overlapping hours--949 hours--and calculates Arnold's overpayment by multiplying the overlapping hours (1,712.75) by her hourly rate ($25) for

a total of $42,818.74.  *Id.*

To the extent the "overlapping hours" formula is flawed, the evidence indicates that it *overstates* the hours Arnold actually worked.  As the Government points out, even if Arnold was credited with attending all of the precinct meetings and breakfasts (with a 5 hour credit for each breakfast), her monthly total would only be 17 hours or 544 hours over 32 months.  Although Arnold testified that she attended a number of events in addition to the precinct meeting and breakfasts, she did not offer specifics about the number of additional events or the hours spent for them.

Defendant attaches a number of flyers to show some of the events Arnold was allegedly assigned.  Def. Exh. 2(G).  However, the fact that Arnold was given the assignments does not prove that she attended or that Defendant reasonably believed that she attended them.

Defendant also attaches notes from Arnold for approximately 58 dates between October 2002 and May 2005, which purportedly are summaries of precinct meetings and other events she attended.  Def. Exh. 2(E).  Of those 58, however, all but 18 are precinct meetings.  So, even if Arnold is credited with having spent 2 hours at each of the 18 additional events, plus 544 hours for all of the precinct meetings and breakfasts, her total hours would only be 580 hours.  Defendant, however, asks the Court to assume from the limited evidence presented that Arnold actually worked approximately 1300 hours.  There is no basis for such a generous estimate.

The Court finds that the Government's estimate of $42,818.74  is reasonable because it is considerably more generous than Defendant presented proofs to support, and Arnold admitted in her Plea Agreement that she was overpaid approximately the

same amount.

### ii.    Britni Barber

The probation department calculates that Ms. Barber was overpaid by $31,680. It is based upon the salary she was paid while she lived and went to school in New York in 2004.  Defendant, contends that the probation department presumes that Ms. Barber did not perform any work when she was not in the City of Detroit or was enrolled in graduate school.  Although Ms. Barber testified (and asserted in her plea) that she only performed approximately 20 hours of work for Defendant while in New York, Defendant points out that she also said that she performed some work in Detroit in 2004 while working for the Super Bowl host committee and in Defendant's office.  Ms. Barber also said that she handled constituent calls while in New York.

Without citation to authority, Defendant asserts that the Court must assess the loss from his perspective, and he claims he was under the impression that the work assigned to Ms. Barber (the stadium report) while she was in New York would require a significant amount of her time.  Also, Defendant says he was out of his office between January 2004 and October 2004 when he was being treated for prostate cancer.

The Government disputes each of Defendant's arguments.  First, the Government asserts that the loss amount was based only on the time for which Ms. Barber was paid while in New York.  Any time spent in Detroit was not included in the calculation.  Second, Ms. Barber testified that she only performed 20 hours of work on the stadium report while in New York, and that she spent less than one hour on constituent calls.  Third, the Government contends that Defendant's claim that he thought Barber was working the entire time she was in New York is not credible

13

because she testified that he did not give her the stadium assignment until sometime after she moved to New York; she was being paid for a period of time before receiving the assignment. Lastly, the Government asserts that Defendant's suggestion that he was unaware Barber was not working because of his illness is not credible because he continued to sign her time cards and deliver Barber's checks to her mother.

The Court finds that the amount calculated by the probation department is a reasonable estimate of the amount Ms. Barber wrongfully received. The Government established at trial that, in 2004, Ms. Barber was paid $30 per hour for 1,056 hours while attending graduate school in New York. The Government established the dates she was in New York (and sometimes Atlanta, Georgia) through bank records showing ATM withdrawals in New York (or Georgia). *See* Gov't Exh. E. During her plea, Ms. Barber admitted that she actually only performed 20 hours of work while in New York. She made the same assertion during trial, except that she claimed to have also spent one hour or less on constituent calls.

Defendant is correct that Ms. Barber testified that there were brief periods of time in 2004 when she was in Detroit and she worked for Defendant either on Super Bowl events or in the office. However, there is no evidence that those times were included in the Government's calculations. *See* Gov't Exh. E. Therefore, the Court finds that the loss amount recommended by the probation department for payments Ms. Barber received is a reasonable estimate of the actual loss.

(Notably, there is a discrepancy in the amount calculated in Defendant's PSIR and the amount calculated in Barber's PSIR. Barber's PSIR indicates a slightly higher loss amount of $31,920, which is the amount the Court ordered her to repay.).

### iii. Melvin Cartwright

The probation department calculates that Mr. Cartwright was overpaid by $7,750. Defendant acknowledges that Mr. Cartwright admitted that he did not work the 40 hours he was paid every two weeks. However, Defendant contends that during Mr. Cartwright's rather confusing testimony he claimed to have worked most of the hours for which he was paid. Therefore, Defendant asserts that the loss attributed to Mr. Cartwright should be capped at the statutory amount of $5,000.

The Government points out that Mr. Cartwright testified before the grand jury that he was paid for 636 hours, but only worked approximately 34 hours. He acknowledged this testimony during the trial and did not contradict it. Mr. Cartwright, through counsel, also negotiated an agreement to pay back $7,100 of the $7,750 he was paid during his tenure. *See* Gov't Exh. G.

The Court reduces the loss amount to $7,100. Although Mr. Cartwright's testimony was confusing, he clearly admitted to the grand jury that he only worked 34 of the 636 hours for which he was paid. Tr. Vol. 5, p. 19. He did not recant that testimony during the trial. And, he signed an agreement to repay $7,100 to the City of Detroit, which he stated at trial was to pay the City back for hours he did not work. Def. Exh. G; Tr. Vol. 5, p. 31. $7,100 is a reasonable estimate of actual loss.

### iv. Jollan Johnson

The probation department calculates that overpayments to Mr. Johnson and checks made payable to him but cashed by Defendant total $10,000. The Government calculates the same amount; it presents a chart showing that checks were issued to

Johnson for 1000 hours at $10 per hour.  *See* Gov't. Exh. H.  And, the Government argues that the entire amount should be repaid because Johnson testified that he did not perform any work for the City; he only did yard work on two of Defendant's properties and other odd jobs.

Defendant, however, asserts that Johnson did perform some work for the City. Zen Braswell told the grand jury that Johnson worked during the Christmas turkey giveaway in December 2003 for ten days, four hours per day.  Def. Exh. 2(A) at p. 13. Braswell also said that he saw Johnson at three or four senior breakfasts, an unspecified number of community meetings (and he implied that Johnson gave oral reports on those community meetings), and that he came into the office once a week. *Id* at pp. 13-14.  Kimberly Wardford, a legislative assistant for Defendant from April 2003 through March 2004, also said that she saw Johnson working the turkey giveaway.  Tr. Vol. 3, p. 22.  However, she said that she only saw Johnson in the office three or four times during the year, and that he did not do any work while there.  *Id* at 7, 22.  Andrea Perry worked for Defendant from June 2002 through June 2004.  She said that Johnson came into the office for meetings once or twice per month.  Tr. Vol. 4, p. 55.

Defendant also cites the handwritten notes of an agent who interviewed him as evidence that Johnson performed some work for the City.  The agent's notes were taken during an October 2005 interview with Johnson and include the following notation:

Sometimes 3x per wk. on [unintelligible]

Sometimes < 3x per wk.

Several occasions 0

< ½ of hours recorded

Def. Reply, Exh. A.  Defendant contends that this note indicates that Johnson told the agent that he sometimes worked 3 days per week, less than three days, or no days, contrary to the Government's claim that he never worked.

Lastly, Defendant contends that Johnson was motivated to testify at trial that he did not do any City work because of his desire to curry favor with the Government.  And, Defendant says that Johnson's City paychecks were not for work done at Defendant's personal properties.  Defendant says Johnson performed the work at Defendant's houses in exchange for being allowed to live in one of Defendant's homes for free for nearly one year.

The Court finds that only a nominal reduction in the probation department's calculation is warranted.  Johnson offered credible testimony that he only performed yard work and odd jobs for Defendant while being paid as a City employee.  Tr. Vol. 2, pp. 102-103.  He admitted that he made contrary statements to the grand jury and investigating agents in an effort to protect Defendant.  *Id* at 106, 134-136.  Johnson said he wanted to protect Defendant because he was a father-figure who helped him more than anyone else had.  *Id* at pp. 106, 160.  Johnson acknowledged that Defendant took him into the office on five or six occasions.  *Id* at 105.  But, he said that he did not do any work while there and that he believed Defendant only took him in periodically "to make things look good."  *Id* at 105, 147.  Though Braswell and Perry claim that Johnson was in the office much more, neither indicated that he did any work.  Braswell also claims he saw Johnson at senior breakfasts and community meetings, but, again, he did not indicate what, if any, work Johnson performed while there.

There is no evidence to support Defendant's suggestion that Johnson was

motivated to lie when he testified in order to curry favor with the Government, or that Johnson's performed yard work in exchange for housing. Although Johnson could be charged for his participation in the scheme, it appears that the Government has not indicated any intention to do so or that they promised to refrain from doing so in exchange for Johnson's testimony. *Id* at pp. 130-131. Therefore, there is no apparent reason for him to curry favor with the Government. With respect to Defendant's claim that Johnson worked on his yards because he did not pay rent or utilities, it is contradicted by Johnson's testimony that he paid Defendant $200 per month for rent. *Id* at 145. The Court believes Johnson was the more credible witness.

There may be merit to Braswell and Wardford's claim that Johnson assisted with the turkey giveaway. Johnson was not specifically asked whether he worked on the turkey giveaway, so he does not contradict their claims. And, he says Defendant took him into the office on occasion. But, crediting Braswell's testimony, this would only account for 40 hours at $10 per hour ($400). Therefore, the probation department's calculation will be reduced by $400, for a total loss of $9,600.

### d.    Health

Without specifically requesting a departure or variance because of his medical condition (or citing authority for either), Defendant points out that he has diabetes, acid reflux, high blood pressure, and arthritis. PSIR at ¶74. Fifteen years ago he was diagnosed with an enlarged heart, and two years ago he was treated for prostate cancer. *Id.* Defendant takes twelve medications daily for these ailments and he is under the care of seven doctors. *Id.*

Before *United States v Booker,* 543 U.S. 220 (2005), a defendant's physical

18

condition was not deemed relevant to whether a departure was warranted unless the defendant's condition constituted an extraordinary physical impairment:

> Physical condition or appearance, including physique, is not ordinarily relevant in determining whether a departure may be warranted. However, an extraordinary physical impairment may be a reason to depart downward; e.g., in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment.

U.S.S.G. §5H1.4.  Post-*Booker* the Court is only constrained by the requirement that a physical impairment be "extraordinary" when considering whether a downward departure is warranted as part of its calculation of the appropriate advisory guideline range.  *See United States v McBride*, 434 F.3d 470, 475-476 (6th Cir. 2006).  Now, even if a defendant's medical condition does not warrant a departure from the advisory guideline range, the Court may grant a variance from the guideline range under 18 U.S.C. §3553(a)(2), which requires that the Court impose a sentence that provides a defendant with needed medical care.  *See United States v Webb*, 403 F.3d 373, 383 (6th Cir. 2005), *cert den.,* 126 S.Ct. 1110 (2006).

It appears that Defendant's conditions are controlled by a regimen of medications, and Defendant has not demonstrated that his ailments or medical needs warrant either a departure or a variance.  Defendant does not identify anything "extraordinary" about his conditions or necessary treatments.  He also does not present evidence (or even argue) that the Bureau of Prisons ("BOP") could not adequately meet his needs.  Therefore, the Court finds that neither downward departure nor a variance is warranted for health reasons.  The BOP can address Defendant's health issues effectively.

Based on the foregoing, the Court finds that the Probation Department properly calculated Defendant's offense level at 20 and his criminal history at I, rendering a guideline range of 33-41 months. No downward departure based on health is warranted. The loss amount will be recalculated at $92,248.74.

**e.      18 U.S.C. § 3553 Factors**

The Court has already taken into account the health of Defendant as a 3553(a) factor urged by the Defendant and finds that a variance based on health is not warranted, as discussed above.

18 U.S.C. § 3553 (a)(2) requires the district court to "impose a sentence sufficient, but not greater than necessary," to comply with the purposes of the statute. That section provides that a sentence must be based upon:

(1)      the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)      the need for the sentence imposed –

(A)      to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)      to afford adequate deterrence to criminal conduct;

(C)      to protect the public from further crimes of the defendant; and

(D)      to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3)      the kinds of sentences available;

(4)      the kinds of sentence and the sentencing range established for –

> (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines...;
>
> (5) any pertinent policy statement ... [issued by the Sentencing Commission];
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

18 U.S.C. §3553(a)(1), (3)-(7).

The guidelines are only one of several equally important factors to be considered in constructing a "reasonable" sentence. *United States v Foreman*, 436 F.3d 638, 644 (6th Cir. 2006)(*citing United States v Williams*, 436 F.3d 706)(6th Cir. 2006 ("*Williams* does not mean that a sentence within the Guidelines is reasonable if there is no evidence that the district court followed its statutory mandate to 'impose sentence sufficient, but not greater than necessary' to comply with the purpose of sentencing in section 3553(a)(2)").

The Court now turns to these other § 3553(a) factors.

The Court notes that Mr. Bates had a long career as a public servant in the City of Detroit and no criminal history. He served on the Detroit Board of Education, served as an executive administrator for personnel and ultimately as a councilman for the City of Detroit. During his tenure as a member of the Board of Education, Mr. Bates established a school named after him, The Bates Academy, which is noted for its academic excellence. Many of the letters in support of Defendant mention his

commitment to youth, education, and to academic excellence that has spanned a lifetime.

However, this long career as a public servant was tinged, sullied and overshadowed by the crimes Mr. Bates involved himself in. These crimes involved fraud and misuse of public funds belonging to a City which needs every dime it can get its hand on simply to provide basic services to its citizens. Defendant was only able to commit these crimes because he held a position of public trust and was able to function virtually without oversight and without the need to be accountable.

The amount of fraud committed -- less than $100,000 -- is not substantial compared to the City's overall budget. However, the attention that this case has received and the outrage expressed by citizens and taxpayers in letters sent to the Court, underscore that it is not so much the amount of money involved as it is the betrayal. It is a disgrace to the office when citizens find they cast their vote for someone they believed would uphold the law, only to find out that he was an unscrupulous individual, lacking in integrity and prepared to place his friends above the constituents that he took an oath to represent, and to serve in their best interest.

Defendant is retired from public life and the Court believes it is unlikely that he will engage in criminal conduct in the future. Defendant continues to deny his factual guilt for the conduct that led to his conviction.

The Court considers all of these characteristics of the Defendant, the nature and circumstances of the offense, other relevant conduct, and the interest of the public in fashioning Defendant's sentence.

The Court is aware that it has the ability to sentence Mr. Bates to either more or

less time than the applicable guidelines.  Defendant asks the Court to impose a sentence of community detention.  Some supporters of Defendant argue that he has suffered enough by his conviction, public scorn and ridicule.  The Court disagrees.  The manipulation of public funds by Mr. Bates should not be rewarded with leniency.  His crimes are serious and evidence an utter disrespect by Defendant of the rules of law that pertain to him and to every public servant.  That Defendant returned surplus funds from his annual budget as a City Councilman is of no moment.  These funds were public monies and not his own.  He was obligated to return unused funds.

His crimes also add to the sometimes well-placed distrust the public has of its elected officials.  In order to reflect the seriousness of the crimes, deter other public officials, promote respect for the law and provide just punishment, the Court finds that a sentence within the applicable guideline range is "sufficient but not greater than necessary" to comply with the purposes of 18 U.S.C. 3553.  The Court finds that a sentence of 33 months is appropriate and reasonable to address the abuses committed by this Defendant.

**IT IS ORDERED.**

 **/s/ Victoria A. Roberts**
**Victoria A. Roberts**
**United States District Judge**

**Dated:  September 20, 2007**

The undersigned certifies that a copy of
this document was served on the
attorneys of record by electronic means or
U.S. Mail on September 20, 2007.

**s/Carol Pinegar**
**Deputy Clerk**

24