UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                    Plaintiff,              CASE NUMBER:  05-81027
                                            HONORABLE VICTORIA A. ROBERTS
v.

ALONZO BATES, et al.,

                    Defendants.
_____/

### <u>ORDER</u>:
### <u>DENYING DEFENDANT'S MOTION TO VACATE, IN PART;</u>
### <u>GRANTING THE GOVERNMENT'S MOTION TO DISMISS IN PART; AND FOR</u>
### <u>EVIDENTIARY HEARING ON DEFENDANT'S SIXTH AMENDMENT CLAIM</u>

## I.     INTRODUCTION

Before the Court is Defendant Alonzo Bates's motion to vacate, set aside or

correct his sentence pursuant to 28 U.S.C. § 2255 (Dkt. #120), and the Government's

motion to dismiss (Dkt. #124).

Defendant's motion to vacate is **DENIED IN PART**; the Government's motion to

dismiss is **GRANTED IN PART**; the Court will hold an evidentiary hearing on

Defendant's Sixth Amendment fair-cross-section claim.

## II.    BACKGROUND

On March 9, 2006, a grand jury returned a superseding indictment charging

Defendant Alonzo Bates with: mail fraud, in violation of 18 U.S.C. § 1341 (Counts I-IV);

theft from a program receiving federal funds, in violation of 18 U.S.C. § 666 (Counts V-

VIII); extortion, in violation of 18 U.S.C. § 1951 (Count IX); bank fraud, in violation of 18

U.S.C. § 1344 (Count X); and failure to file income tax returns, in violation of 26 U.S.C.

§ 7203 (Counts XI-XIV).

On August 22, 2006, Defendant pled guilty to Counts XI-XIV and the Government dismissed Counts I-IV.  Defendant went to trial on the remaining counts, which were based in part on allegations that he used his position as a Detroit city councilman to employ and pay friends and relatives with public funds for work they did not perform. On August 31, the jury convicted Defendant on Counts V-VIII and X, but was unable to reach a verdict on Count IX.

On September 20, 2007, the Court sentenced Defendant to 33 months in prison on Counts V-VIII and X, and 12 months on Counts XI-XIV to be served concurrently. Defendant filed a notice of appeal on the same day; his appeal is pending in the Sixth Circuit Court of Appeals under docket no. 07-2183.

On February 27, 2009, Defendant filed this motion to vacate, stating two claims of ineffective assistance and challenging the constitutionality of the Eastern District of Michigan's Juror Selection Plan.  On August 21, 2009, the Court denied one ineffective assistance claim as sufficiently developed for resolution on direct appeal, and ordered further briefing on whether: (1) the Juror Selection Plan discriminates against African Americans; and (2) trial counsel was ineffective when he failed to object to jury selection procedures.

The Court heard oral arguments on September 23, 2009, at which time Defendant announced he was dropping his remaining ineffective assistance claim.

## III.   ANALYSIS

Defendant contends the Eastern District of Michigan's Juror Selection Plan, which was used to select his grand and petit juries, discriminates against African-

Americans.  Defendant alleges violations of his rights under the Jury Selection and
Service Act ("the JSSA" or "the Act"), 28 U.S.C. § 1861 et seq., and the Fifth and Sixth
Amendments of the United States Constitution.  The Court addresses Defendant's
JSSA claim before considering his constitutional claims.

### A.      Jury Selection and Service Act Claim

The JSSA embodies the policy of the United States that "all litigants in Federal
courts entitled to trial by jury shall have the right to grand and petit juries selected at
random from a fair cross section of the community in the district or division wherein the
court convenes."  28 U.S.C. § 1861.

The Act allows criminal defendants to move to dismiss an indictment or stay
judicial proceedings "before the voir dire examination begins, or within seven days after
the defendant discovered or could have discovered, by the exercise of diligence, the
grounds therefor, *whichever is earlier* . . . ."  § 1867(a) (emphasis added).  This
timeliness requirement "is to be strictly construed, and failure to comply precisely with
its terms forecloses a challenge under the Act."  *United States v. Ovalle*, 136 F.3d 1092,
1098 (6th Cir. 1998) (*quoting United States v. Bearden*, 659 F.2d 590, 595 (5th Cir.
1981), *cert. denied*, 456 U.S. 936 (1982)).  *See also United States v. Young*, 570 F.2d
152, 153 (6th Cir. 1978).

Defendant did not file a JSSA challenge prior to the voir dire examination; in fact,
Defendant candidly admits he first discovered this alleged cause of action around July
2008, two years after his conviction.  Therefore, Defendant's JSSA claim is time-barred.
*See Ovalle*, 136 F.3d at 1099 n.10 (defendants' claims were barred by § 1867(a)'s
requirement that any motion "be filed prior to the voir dire examinations at the latest.").

3

## B.    Constitutional Claims

The equal protection component of the Fifth Amendment's Due Process Clause, *Bolling v. Sharpe*, 347 U.S. 497, 499-500 (1954), prohibits the purposeful exclusion of jurors from grand or petit juries on the basis of race.  *Ovalle*, 136 F.3d at 1104 (*citing Powers v. Ohio*, 499 U.S. 400, 415 (1991)).  In addition, the Sixth Amendment protects a defendant's right to a jury selected from a representative cross-section of the community.  *Taylor v. Louisiana*, 419 U.S. 522, 528 (1975).

The Court first addresses whether Defendant's constitutional claims are defaulted before considering the merits of those claims.

### 1.    Procedural Default Analysis

Untimely challenges to grand or petit jury composition may be waived or procedurally defaulted.  Federal Rule of Criminal Procedure 12(b)(3)(B) provides that motions "alleging a defect in the indictment or information" must be raised before trial. In *United States v. Ovalle*, the Sixth Circuit explained:

> Federal Rule of Criminal Procedure 12(b)(2) governs an untimely claim of discrimination in the selection of the grand jury, "even when such challenges are on constitutional grounds."  "Challenges of the petit jury are treated the same as challenges of the grand jury."
>
> Failure to raise an objection to the selection of the grand or petit jury prior to trial "shall constitute waiver thereof, but the court for cause shown may grant relief from the waiver."

*Ovalle*, 136 F.3d at 1107 (*quoting Davis v. United States*, 411 U.S. 233, 238 (1973); *United States v. Hearst*, 638 F.2d 1190, 1196 (9th Cir. 1980); Fed. R. Crim. P. 12(f)) (other citations omitted).  Congress amended the Federal Rules of Criminal Procedure in 2002.  What *Ovalle* refers to as Rule 12(b)(2) is, in the amended version, Rule

4

12(b)(3); likewise, Rule 12(f) is now Rule 12(e).  The Advisory Committee specified the amendments to Rule 12 were "part of the general restyling of the Criminal Rules" and that "[n]o change in practice is intended."  Fed. R. Crim. P. 12 advisory committee note.

Defendant did not challenge the selection of his grand or petit jury before trial. Thus, his objection is procedurally defaulted unless he can show cause and actual prejudice.  *Ovalle*, 136 F.3d at 1107; Fed. R. Crim. P. 12(e).  "[R]elief from the Rule [12(b)(3)] requirements is only appropriate where the district court has made a finding of 'cause and actual prejudice.'"  *Ovalle*, 136 F.3d at 1107 (*citing United States v. Oldfield*, 859 F.2d 392, 397 (6th Cir. 1988)).  *See also Shotwell Mfg. Co. v. United States*, 371 U.S. 341, 362-63 (1963) (under Rule 12(b)(3), petit jury challenges made after trial are waived unless the defendant shows cause for failing to raise the issue and actual prejudice from the alleged illegalities); *Davis*, 411 U.S. at 242 (*Shotwell*'s "cause and prejudice" standard applies not only on direct appeal, but also to collateral claims under § 2255).

### a.    Cause for Failure to Raise

The Supreme Court has yet to provide a complete definition of the cause and prejudice standard.  *See Wainwright v. Sykes*, 433 U.S. 72, 87 (1977) (leaving the question for future decisions); *Dugger v. Adams*, 489 U.S. 401, 406-07 (1989) (*citing Wainwright*).  However, the Court provided some guidance in *Murray v. Carrier*, when it stated:

> So long as a defendant is represented by counsel whose performance is not constitutionally ineffective under the standard established in *Strickland v. Washington*, [466 U.S. 668 (1984)], we discern no inequity in requiring him to bear the risk of attorney error that results in a procedural default. Instead, we think that the existence of cause for a procedural default must

5

ordinarily turn on whether the prisoner can show that some objective
factor external to the defense impeded counsel's efforts to comply with the
State's procedural rule.

477 U.S. 478, 488 (1986).

This excerpt and the Court's post-*Murray* jurisprudence indicate that cause for

failing to raise a claim at trial or on appeal may be found where: (1) a factor external to

the defense impeded counsel's efforts; or (2) counsel's assistance was constitutionally

deficient. Since Defendant no longer claims his counsel was ineffective for failing to

challenge his grand and petit juries, the Court considers only the first option.

In *Reed v. Ross*, the Supreme Court held: "the failure of counsel to raise a

constitutional issue reasonably unknown to him is one situation in which the [cause]

requirement is met." 468 U.S. 1, 14 (1984) (footnote omitted). The Court later added

that the cause standard could be met by "showing that the *factual or legal* basis for a

claim was not reasonably available to counsel." *Murray*, 477 U.S. at 488 (*citing Ross*,

468 U.S. at 16) (emphasis added). *See also Amadeo v. Zant*, 486 U.S. 214, 222

(1988).

Defendant argues the facts of his jury challenge were reasonably unknown to his

trial counsel, because: (1) the Juror Selection Plan is constitutional on its face, and (2) a

physical inspection of the Master Jury Wheel was necessary to reveal its alleged

defects.

For purposes of this motion, the Court assumes, without deciding, that counsel

for the defense was reasonably unaware of the factual basis for Defendant's

constitutional jury claims. This unawareness was caused by a factor external to the

defense which impeded counsel's ability to challenge the Juror Selection Plan before

6

trial.  Therefore, the discussion turns to whether Defendant established prejudice.

### b.      Prejudice from Failure to Raise

To establish that he was prejudiced by his counsel's failure to challenge the Juror Selection Plan, "[D]efendant must show that there is a reasonable probability that, but for counsel's [failure to raise the issue before trial], the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Strickland*, 466 U.S. at 694.  In cases involving racial discrimination in the selection of jurors, prejudice is presumed if a constitutional violation is established.  *See Bank of Nova Scotia v. United States*, 487 U.S. 250, 257 (1988) (prejudice is presumed where "the structural protections of the grand jury have been so compromised as to render the proceedings fundamentally unfair"); *Vasquez v. Hillery*, 474 U.S. 254, 263 (1986) ("When constitutional error calls into question the objectivity of those charged with bringing a defendant to judgment, a reviewing court can neither indulge a presumption of regularity nor evaluate the resulting harm."); *Rose v. Mitchell*, 443 U.S. 545, 556 (1979) (rejecting harmless-error standard for claims of racial discrimination in jury selection "[b]ecause discrimination on the basis of race . . . strikes at the fundamental values of our judicial system and our society as a whole").

In order to assess whether a reasonable probability exists that the outcome of Defendant's trial would have been different if counsel had challenged the Juror Selection Plan, the Court must determine whether such a challenge could succeed on the merits.  *See United States v. Orange*, 447 F.3d 792, 797 (10th Cir. 2006) ("When, as here, the basis for the ineffective assistance claim is the failure to raise an issue, we must look to the merits of the omitted issue.").  Therefore, the Court turns to the merits

7

of Defendant's Fifth and Sixth Amendment claims.

**2.    Merits of Defendant's Constitutional Claims**

At the outset, it is helpful to describe the Eastern District of Michigan's Juror Selection Plan.

The Eastern District covers 34 counties in Michigan's lower peninsula.  For jury-selection purposes, the District is split into five divisions; each division draws jurors from a certain number of counties.  *See* E.D. Mich. Admin. Order No. 00-AO-083 (Dec. 26, 2000) [hereinafter Juror Selection Plan] § (d).  This Court sits in the Detroit Division, which selects its jurors from nine counties: Jackson, Lenawee, Macomb, Monroe, Oakland, St. Clair, Sanilac, Washtenaw and Wayne.  *Id.*

In 1998, the Sixth Circuit struck down the Eastern District's jury-selection system as unconstitutional.  *Ovalle*, 136 F.3d at 1107.  Following *Ovalle*, the Court designed and enacted the current Juror Selection Plan.  *See United States v. Fieger*, No. 07-20414, 2008 WL 1902054, 2008 U.S. Dist. LEXIS 34806, at *3-4 (E.D. Mich. Apr. 29, 2008) (unpublished).  Under this Plan, the Clerk of the Court must generate a Master Jury Wheel for each of the District's five divisions, ensuring that "each county within a division is proportionally represented."  *Id.* at *4 (*quoting* Juror Selection Plan § (h)(2)) (citation omitted).

For each division, voter registration lists are used to calculate the proportional representation of individual counties.  The proportional representation determination dictates how many names to draw from each county to compose the division's Master Jury Wheel.  The names themselves are obtained by random selection from voter registration lists, the state drivers' license list, and Michigan's personal identification

8

card list.  Juror Selection Plan § (f).  *See also United States v. Brown*, 128 F. Supp. 2d 1034, 1037 & n.5 (E.D. Mich. 2001); *Fieger*, 2008 U.S. Dist. LEXIS 34806, at *23-24.

Records pertaining to current Master Jury Wheels are disclosed on a case-by-case basis, upon a showing of good cause.  *See Fieger*, 2008 U.S. Dist. LEXIS 34806, at *9-10 (*citing* E.D. Mich. Admin. Order No. 00-AO-060 (Oct. 19, 2000); *United States v. Montini*, No. 03-80228, 2003 WL 22283892, 2003 U.S. Dist. LEXIS 17672, at *8 (E.D. Mich. Sept. 3, 2003) (unpublished)) (other citation omitted).  However, records relating to prior jury wheels are available for public inspection.  *Id.* at *9 n.6 (*citing* 28 U.S.C. § 1868).  Defendant relies on data obtained through a physical inspection of the Detroit Division's Master Jury Wheel for 2004-2006 for his challenge.

In 2004, the Court ordered the creation of a new Master Jury Wheel for the Detroit Division comprised of 100,000 names.  E.D. Mich. Admin. Order No. 04-AO-016 (Feb. 23, 2004).  The proportion of the division's nine counties in this Master Jury Wheel would be: Jackson (3.09%); Lenawee (1.96%); Macomb (16.22%); Monroe (3.08%); Oakland (25.25%); St. Clair (3.32%); Sanilac (0.88%); Washtenaw (6.8%); and Wayne (39.4%).  *Id.*  This new Master Jury Wheel became effective on October 1, 2004, and lasted until September 30, 2006.  *See* E.D. Mich. Admin. Order No. 06-AO-005 (Feb. 22, 2006).

Defendant's factual allegations rest principally on a physical examination of the Detroit Division's 2004-2006 Master Jury Wheel.  The examination was conducted by Anthony Cairo, who submits his findings in an attachment to Defendant's motion. (Def.'s Mot. Ex. B, Affidavit of Anthony E. Cairo (Feb. 26, 2008) [hereinafter Cairo Aff.].)  For purposes of this discussion, the parties agree that African Americans make up

roughly 22% of the Detroit Division's population.  Among the nine counties which form

the Division, Wayne has the highest proportion of African Americans (41.8%), compared

to 0.4 - 12.5% in the other counties.  *See Fieger*, 2008 U.S. Dist. LEXIS 34806, at *7-8.


According to Mr. Cairo, the Clerk of the Court provided him with 26,167 juror-

qualification questionnaires, and represented that "these documents comprised the

[C]ourt's [M]aster [J]ury [W]heel for 2004-2006."  (Cairo Aff. ¶ 2.)  It is unclear why Mr.

Cairo was given only 26,167 of the 100,000 names in the Master Jury Wheel.

Nonetheless, juror qualification questionnaires were sent to these 26,167 people.  Once

undeliverable questionnaires and unqualified jurors were removed, 17,798 qualified

jurors remained.  (Cairo Aff. Table 1.)  These 17,798 names formed the Qualified Jury

Wheel: all of the Court's grand and petit jurors for 2004-2006 were drawn from there.

Mr. Cairo states his investigation revealed a significant discrepancy between the

proportion of questionnaires destined for each county and the number actually received

in each county: most counties received more questionnaires than intended, while

Wayne County alone received almost 10% less than required by Administrative Order

No. 04-AO-016.

| County | % of quest. due under Admin. Order No. 04-AO-016 | # of quest. due | % of quest. received | # of quest. received |
|---|---|---|---|---|
| Jackson | 3.09 | 3,090 | 3.55 | 930 |
| Lenawee | 1.96 | 1,960 | 2.28 | 596 |
| Macomb | 16.22 | 16,220 | 18.05 | 4,724 |
| Monroe | 3.08 | 3,080 | 3.45 | 903 |

| Oakland | 25.25 | 25,250 | 28.66 | 7,500 |
|---|---|---|---|---|
| St. Clair | 3.32 | 3,320 | 3.72 | 974 |
| Sanilac | 0.88 | 880 | 0.85 | 222 |
| Washtenaw | 6.8 | 6,800 | 6.92 | 1,812 |
| Wayne | 39.4 | 39,400 | 29.88 | 7,819 |
| Others | | | 2.64 | 687 |
| Total | 100% | 100,000 | 100% | 26,167 |

(Cairo Aff. ¶ 10, Table 2.)  In addition, according to Mr. Cairo, 2.64% of questionnaires were delivered to counties outside the Detroit Division.

Defendant argues that Wayne County's disproportionately low share of questionnaires caused it to be underrepresented in the 2004-2006 jury wheel; since Wayne has the largest African American population of the Detroit Division, this caused African Americans to be underrepresented as well.  Defendant contends that, although they represent 22% of Detroit Division residents, African Americans accounted for only 9.89% of qualified jurors in the 2004-2006 jury wheel.  (Cairo Aff. ¶ 11, Table 3.)

### a.    Fifth Amendment Claim

The Equal Protection Clause of the Fifth Amendment prohibits intentional racial discrimination in the selection of juries.  *Swain v. Alabama*, 380 U.S. 202, 203-04 (1965); *Jefferson v. Morgan*, 962 F.2d 1185, 1188 (6th Cir. 1992).  To establish the prima facie case of an equal protection violation, a defendant must show that: (1) the excluded group is "a recognizable, distinct class, singled out for different treatment under the laws"; (2) the jury selection procedure results in "substantial underrepresentation" of the target group "over a significant period of time"; and (3) the

11

jury selection process is "susceptible of abuse" or "not racially neutral." *Castaneda v. Partida*, 430 U.S. 482, 494 (1977); *Jefferson*, 962 F.2d at 1188. If the defendant establishes each element, there arises a presumption of unconstitutional action, which the Government may rebut "by showing that permissible racially neutral selection criteria and procedures have produced the monochromatic result." *Castaneda*, 430 U.S. at 494 (quotation omitted).

### i.   Distinctive Group

It is undisputed that African Americans are a "distinctive group" for the purpose of jury composition challenges. *Peters v. Kiff*, 407 U.S. 493, 503 (1972); *Jefferson*, 962 F.2d at 1189. Thus, the first prong of the equal protection test is met.

### ii.   Substantial Underrepresentation over a Significant Period

When assessing whether a distinct group is substantially underrepresented in a jury pool, most courts apply the "absolute disparity" standard. *See United States v. Royal*, 174 F.3d 1, 8-9 (1st Cir. 1999) (discussing cases). "Absolute disparity measures the difference between the percentage of members of the distinctive group in the relevant population and the percentage of group members on the jury wheel." *Id.* at 6-7. The greater the spread between percentages, the more likely substantial underrepresentation exists.

The Sixth Circuit applies absolute disparity in cases where the minority group is reasonably large, but prefers comparative disparity when the underrepresented group forms a small percentage of the population. *See Smith v. Berghuis*, 543 F.3d 326, 337-38 (6th Cir. 2008) (applying comparative disparity where African Americans formed

12

7.8% of jury-eligible population), *reh'g and reh'g en banc denied* (Feb. 9, 2009), *cert. granted*, ___ S.Ct. ___, No. 08-1402, 2009 WL 1370175, 2009 U.S. LEXIS 5145 (Sept. 30, 2009).  *See also United States v. Rogers*, 73 F.3d 774, 777 (8th Cir. 1996) (using comparative disparity where African Americans comprised 1.87% of jury-eligible population).

Since African Americans constitute roughly 22% of the Detroit Division's population, the Court applies the absolute disparity test.  *See Ford v. Seabold*, 841 F.2d 677, 683-84 (6th Cir. 1988) (using absolute disparity where 53% of the population was female).  The Court also notes the Supreme Court granted certiorari in *Smith* on the issue of whether the Sixth Circuit correctly used comparative instead of absolute disparity.

Defendant's inspection of the Master Jury Wheel indicates Wayne County residents accounted for only 29.88% of the Court's total jury pool in 2004-2006, instead of 39.4%.  Defendant argues that, because of this discrepancy, African Americans formed only 9.89% of the jury pool, compared to 22% of the Detroit Division – an absolute disparity of 12.11%.  To show this underrepresentation was sustained over time, Defendant also submits six venires drawn from the Master Jury Wheel: the percentage of African Americans in these venires fluctuates between 8.8% and 12.5%. (Def.'s Reply Ex. A at 3-8.)

Courts have not identified a specific percentage which, on its own, proves intentional discrimination occurred.  *See Swain*, 380 U.S. at 208-09 ("We cannot say that purposeful discrimination . . . is satisfactorily proved by showing that [a group] is underrepresented by as much as 10%.").  Jury selection plans with greater disparities

13

than those observed by Defendant have been both struck down and upheld.  *Compare Whitus v. Georgia*, 385 U.S. 545, 551 (1967) (finding unconstitutional underrepresentation with 18% absolute disparity); *Hernandez v. Texas*, 347 U.S. 475, 479 (1954) (same, with 14% disparity); *Jefferson*, 962 F.2d at 1188 (same, with 12.6% disparity); *Stephens v. Cox*, 449 F.2d 657, 659 (4th Cir. 1971) (same, with 15% disparity) *with United States v. Smallwood*, 188 F.3d 905, 914-15 (7th Cir. 1999) (no unconstitutional underrepresentation found, despite 20% absolute disparity); *Ramseur v. Beyer*, 983 F.2d 1215, 1232-33 (3d Cir. 1992) (same, despite 14.1% disparity); *Ford*, 841 F.2d at 685 (same, despite 21.7% and 18.7% disparities in consecutive years). *See also United States v. Grisham*,  63 F.3d 1074, 1079 (11th Cir. 1995) (in a Sixth Amendment challenge, absolute disparity of 10% or less fails to satisfy the second prong).

For our purposes, it suffices to recognize that a 12.11% absolute disparity falls within the range in which courts found unconstitutional discrimination to exist.  Thus, Defendant meets his burden on the second factor: he shows underrepresentation over a significant period of time, since the allegedly deficient jury wheel was in service for two years.

### iii.    Whether Jury Selection Process is Susceptible to Abuse or not Racially Neutral

The third and final factor on which Defendant has the burden to sustain his prima facie equal protection claim is to show the Juror Selection Plan is susceptible to abuse or not racially neutral.  *Castaneda*, 430 U.S. at 494.

The Juror Selection Plan requires jurors to be selected from lists of registered

14

voters, licensed drivers and holders of state identification cards. "Voter registration lists are the presumptive statutory source for potential jurors." *United States v. Odeneal*, 517 F.3d 406, 412 (6th Cir. 2008) (*citing* 28 U.S.C § 1863(b)); *Orange*, 447 F.3d at 800 (same). Courts have consistently upheld the constitutionality of plans using voter registration lists to select jury pools. *See*, *e.g.*, *Smallwood*, 188 F.3d at 915; *United States v. Perry*, 152 F.3d 900, 904 (8th Cir. 1998).

Defendant alleges Wayne County's underrepresentation in the Master Jury Wheel is the result of three factors: (1) jury questionnaires are improperly mailed to people living outside the Detroit Division; (2) Wayne County has the highest number of undeliverable questionnaires; and (3) too many prospective jurors are deceased, or otherwise excused from service. However, these are not factors that can be manipulated. *Cf. Castaneda*, 430 U.S. at 497 ("key man" selection process is "highly subjective" and susceptible of abuse); *Jefferson*, 962 F.2d at 1189 (same); *Stephens*, 449 F.2d at 659-60 (opportunity for discrimination shown where lists of qualified jurors are compiled by commissioners who may rely on their personal knowledge to select persons "of good repute for intelligence and honesty").

Defendant also suggests the Clerk of the Court or an outside vendor may have used incomplete or outdated voter-registration information to compile the Master Jury Wheel, but  these allegations are unsubstantiated. Moreover, Defendant does not allege or supply evidence of intentional discrimination in the selection of jurors. *See United States v. Miller*, 116 F.3d 641, 659 (2d Cir. 1997) ("[A]bsent positive evidence that some groups have been hindered in attempting to register to vote, a jury venire drawn from voter registration lists violates neither the Sixth Amendment's fair

15

cross-section requirement nor the Fifth Amendment's guarantee of Equal Protection.")
(*quoting Schanbarger v. Macy*, 77 F.3d 1424, 1424 (2d Cir.1996) (per curiam)); *United States v. Esquivel*, 88 F.3d 722, 728 (9th Cir. 1996) (without evidence of discriminatory intent, equal protection challenge to a jury-selection system which conforms to the requirements of 28 U.S.C § 1863(b) fails).

Defendant does not suggest that Wayne County's underrepresentation in the Master Jury Wheel is the product of intentional discrimination. Furthermore, he fails to show the Juror Selection Plan is either susceptible to abuse or not racially neutral. Defendant fails to sustain his burden to establish the prima facie elements of an equal protection violation, and therefore the Government is entitled to dismissal of this claim.

**b.      Sixth Amendment Claim**

To establish a prima facie violation of the Sixth Amendment's fair-cross-section requirement,

> the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Duren v. Missouri*, 439 U.S. 357, 364 (1979). "Once the defendant has established a prima facie case, the burden then shifts to the government to show that 'a significant state interest [is] manifestly and primarily advanced by those aspects of the jury selection process . . . that result in the disproportionate exclusion of a distinctive group.'" *Smith*, 543 F.3d at 336 (*quoting Duren*, 439 U.S. at 367-68) (alteration in *Smith*).

Defendant's burden to show that African Americans are a distinctive group is

16

met.  *See Jefferson*, 962 F.2d at 1189.  Defendant also meets *Duren*'s unreasonable

representation prong, by showing a 12.11% absolute disparity between the proportion of

African Americans in the Detroit Division and the Master Jury Wheel.  Thus,

Defendant's claim hinges on whether he can sustain his burden on the third *Duren*

prong and establish that the underrepresentation of African Americans in the Master

Jury Wheel is the result of systematic exclusion in the jury-selection process.

The crucial difference between Fifth and Sixth Amendment claims is that "[u]nlike

the equal protection challenge, the fair cross section claim does not require a showing

that the selection procedure is susceptible [to] abuse or not race-neutral; the defendant

must only show that the exclusion of his or her group is 'systematic.'"  *Smith*, 543 F.3d

at 335-36 (*quoting United States v. Rodriguez-Lara*, 421 F.3d 932, 939 (9th Cir. 2005))

(citation omitted) (alterations in *Smith*).  Systematic exclusion exists when a large

disparity in representation occurs "not just occasionally" and its cause is "inherent in the

particular jury-selection process utilized."  *Duren*, 439 U.S. at 366.

Defendant contends that, although Wayne County was supposed to account for

39.4% of the Master Jury Wheel, it received only 29.88% of all questionnaires mailed; at

the same time, the other counties in the Detroit Division received more than their

allocated share of questionnaires.  Defendant argues this discrepancy results from

inadvertent mailings to out-of-division recipients, excessive amounts of undeliverable

questionnaires and high numbers of jurors excused or deceased.  He also claims the

Court uses information from a third-party vendor to compile the jury wheel, and

suggests this vendor may use inadequate or outdated lists.

Defendant's study is inconclusive, and the Court is unable to decide whether he

17

sustained his burden to show that the underrepresentation of African Americans is due to their systematic exclusion in the jury-selection process. For instance, there is no mention of how many questionnaires were not returned, even though this number can be substantial. *See Smith*, 543 F.3d at 331 (15-20% of all questionnaires were not returned); *Johnson v. Hofbauer*, 159 F. Supp. 2d 582, 598 (E.D. Mich. 2001) (about 10% percent unreturned). There is some evidence that areas with large minority populations tend to have higher non-response rates. *See, e.g., Smith*, 543 F.3d at 331 (study shows minority areas have higher rates of non-return); *In re United States*, 426 F.3d 1, 4 (1st Cir. 2005) (data suggests misdeliveries and nonresponses occur proportionally more often in poor or minority areas). However, courts do not consider this to be evidence of systematic exclusion. *Orange*, 447 F.3d at 800 ("Discrepancies resulting from the private choices of potential jurors do not represent the kind of constitutional infirmity contemplated by *Duren*.") Furthermore, assuming Wayne County really received 10% fewer questionnaires than intended, high rates of undeliverables and deceased jurors are not systemic factors that can explain such a discrepancy.

Defendant's study lacks material information and leaves many important questions unanswered. Under 28 U.S.C. § 2255(b), a defendant is entitled to an evidentiary hearing "[u]nless the motion and the files and records of the case conclusively show that [he or she] is entitled to no relief." *See also Turner v. United States*, 183 F.3d 474, 477 (6th Cir. 1999), *cert. denied*, 528 U.S. 1195 (2000) ("Where there is a factual dispute, the habeas court must hold an evidentiary hearing to determine the truth of the petitioner's claims.").

The Court finds an evidentiary hearing is necessary to rule on Defendant's fair-

18

cross-section claim.

IV.     **CONCLUSION**

The Government's motion is **GRANTED IN PART** and **DENIED IN PART**.

Defendant's Jury Selection and Service Act Claim is **DISMISSED** as time-barred.

On his Fifth Amendment claim, Defendant had the burden to show cause and prejudice: while he established cause, Defendant could not show prejudice, which turns on the merits of his claim.  Indeed, Defendant could not establish the prima facie elements of an equal protection violation.  Therefore, the Court **DISMISSES** Defendant's Fifth Amendment claim.

An evidentiary hearing is necessary before the Court can rule on the merits of Defendant's Sixth Amendment claim.  The hearing will be limited to presentation of evidence on the third *Duren* element: whether the underrepresentation of African Americans in the Master Jury Wheel is caused by factors "inherent in the particular jury-selection process utilized."  439 U.S. at 366.  The Court is particularly interested in testimony explaining why Wayne County residents received only 29.88% of all questionnaires mailed when they should have gotten 39.4%, and whether the reason for this is inherent in the Court's jury-selection system.  A Notice to Appear will issue separately.

**IT IS ORDERED**.

s/Victoria A. Roberts_____
Victoria A. Roberts
United States District Judge

Dated:  October 9, 2009

19

The undersigned certifies that a copy of this document was served on the attorneys of record by electronic means or U.S. Mail on October 9, 2009.

s/Linda Vertriest
Deputy Clerk