UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                Plaintiff,           CASE NUMBER:  05-81027
                                      HONORABLE VICTORIA A. ROBERTS

v.

ALONZO BATES, et al.,

                Defendants.

_____/

## ORDER DENYING: (1) THE GOVERNMENT'S MOTION TO RECONSIDER; AND (2) DEFENDANT'S MOTION TO VACATE

## I.    INTRODUCTION AND PROCEDURAL BACKGROUND

On August 31, 2006, a jury in the Detroit Division of the Eastern District of

Michigan convicted Defendant of stealing from a program receiving federal funds, and

bank fraud.  Defendant moved to vacate his conviction, claiming his attorney rendered

ineffective assistance by failing to challenge the statutory and constitutional validity of

the Eastern District's Juror Selection Plan (Dkt. #120).  Defendant argued that African

Americans are consistently underrepresented in Detroit-Division juries, in violation of

the Jury Selection and Service Act ("JSSA"), 28 U.S.C. § 1861 et seq, the Equal

Protection Clause of the Fifth Amendment, and the fair cross-section requirement of the

Sixth Amendment.

In an Order issued October 9, 2009 (Dkt. #132), the Court held that Defendant's

JSSA claim is time-barred, and that he failed to establish a prima facie violation of the

Fifth Amendment.  *United States v. Bates*, No. 05-81027, 2009 WL 3270190, 2009 U.S.

Dist. LEXIS 94415 (E.D. Mich. Oct. 9, 2009) (unpublished).  In addition, the Court

decided that Defendant failed to raise his Sixth Amendment challenge before trial, as required by Federal Rules of Criminal Procedure 12(b)(3)(B) and (e).  As such, Defendant's claim is procedurally defaulted, unless he can show cause for failing to raise the issue, and actual prejudice resulting from the alleged constitutional deficiency. *See United States v. Ovalle*, 136 F.3d 1092, 1107 (6th Cir. 1998) ("relief from the Rule [12(b)(3)] requirements is only appropriate where the district court has made a finding of 'cause and actual prejudice.'") (*citing United States v. Oldfield*, 859 F.2d 392, 397 (6th Cir. 1988)).

After reviewing the show-cause standard in its October 9th Order, the Court assumed, without deciding, that Defendant met the cause prong of the analysis, and turned to the merits of Defendant's fair cross-representation challenge.  *See United States v. Orange*, 447 F.3d 792, 797 (10th Cir. 2006) (to assess prejudice on an ineffective assistance claim, a court must consider the merits of the omitted issue).  The Court concluded, however, that Defendant's data concerning the Detroit Division's Master Jury Wheel was too rudimentary to permit a final ruling; the Court ordered an evidentiary hearing.

The Government moved for the Court to reconsider its assumption that Defendant showed cause for failing to raise his Sixth Amendment challenge before trial. (Dkt. #135).  The Government pointed out that a defendant is not entitled to an evidentiary hearing unless he establishes both prongs of the procedural default analysis.  *See* 28 U.S.C. § 2255(b) ("Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall . . . grant

2

a prompt hearing thereon . . . ."); *McCleskey v. Zant*, 499 U.S. 467, 494 (1991) ("The petitioner's opportunity to meet the burden of cause and prejudice will not include an evidentiary hearing if the district court determines as a matter of law that petitioner cannot satisfy the standard.").  On November 12, 2009, the Court heard argument on the Government's motion for reconsideration, which was followed by the evidentiary hearing on Defendant's fair cross-section claim.

While the Court may have erred by not clearly ruling on the cause prong of the procedural default analysis, the Court notes that procedural default is not a jurisdictional bar to review of a habeas petition on the merits.  *See Trest v. Cain*, 522 U.S. 87, 89 (1997) ("in the habeas context, a procedural default . . . is not a jurisdictional matter.") (citations omitted).  Furthermore, "federal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits."  *Hudson v. Jones*, 351 F.3d 212, 215 (6th Cir. 2003) (*citing Lambrix v. Singletary*, 520 U.S. 518, 525 (1997)).  "Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural bar issue involved complicated issues of state law."  *Lambrix*, 520 U.S. at 525 (citation omitted).

Because "[t]he cause-and-prejudice analysis is a conjunctive one, requiring a petitioner to satisfy both prongs to excuse a procedural default[,]" *Matthews v. Ishee*, 486 F.3d 883, 891 (6th Cir. 2007), and because the Court holds that Defendant fails to show that he was prejudiced by his counsel's failure to challenge the Juror Selection Plan, the Government's Motion to Reconsider (Dkt. #135) and Defendant's Motion to

3

Vacate (Dkt. #120) are **DENIED**.

## II.   FACTUAL BACKGROUND

Defendant alleges that Wayne County is disproportionately underrepresented in the Eastern District of Michigan's 2004-2006 Master Jury Wheel for the Detroit Division ("the Master Wheel"). Since Wayne has the largest African-American population in the Division, Defendant argues this causes African Americans to be underrepresented as well.

At the November 12, 2009 evidentiary hearing, Defendant submitted several exhibits, most of which were already part of the record. Additionally, Defendant called three witnesses: Anthony Cairo, who conducted and supervised a physical inspection of the 2004-2006 Master Wheel; Theresa Hryshko, Jury Administrator and Court Services Supervisor for the Eastern District; and Dr. Michael Thomson, an economist and statistician.[1]

The Court begins with a description of the Eastern District of Michigan's Juror Selection Plan. For the sake of clarity, this discussion may repeat some information from prior orders.

### A.   The Eastern District's Juror Selection Plan

The Eastern District covers 34 counties in Michigan's lower peninsula. For jury-selection purposes, the District is split into five divisions; each division draws jurors from certain counties. *See* E.D. Mich. Admin. Order No. 00-AO-083 § (d) (Dec. 26, 2000)

---

[1] The Court wishes to thank the Eastern District of Michigan's Jury Department, particularly Theresa Hryshko and Arthur McCoy, for their invaluable assistance and constant availability during these proceedings.

[hereinafter Juror Selection Plan]. This Court sits in the Detroit Division, and is to select jurors from nine counties: Jackson, Lenawee, Macomb, Monroe, Oakland, St. Clair, Sanilac, Washtenaw and Wayne. *Id.*

The jury-selection process begins when the Eastern District's Jury Department obtains three lists from the Michigan Secretary of State: registered voters, licensed drivers, and holders of state-issued identification documents. Juror Selection Plan § (f); (Transcript of Evidentiary Hearing 48, Nov. 12, 2009 [hereinafter Hr'g Tr.]). *See also* 28 U.S.C. § 1863(b)(2) (a district must use "some other source or sources of names in addition to voter lists" if doing so is necessary to ensure representativeness and avoid excluding jurors on the basis of race, color, religion, sex, national origin, or economic status). The Jury Department provides the list of registered voters to Sutera Data Systems ("SDS"), a data-processing firm contracted to compile the Master Wheel. Juror Selection Plan § (g)(3) (Jury Department may hire outside contractors to implement the Plan); (Hr'g Tr. 57, 70). SDS determines the number of registered voters in each of the nine counties comprising the Detroit Division, and calculates each county's proportionate share of the Division's total voting population. Based on these figures, the Court issues an Administrative Order to create a new Master Wheel for the Division, in which it specifies the number of people to be drawn from each county for possible jury service. Juror Selection Plan § (h)(2) (voter-registration lists must be used to determine the proportion of jurors from each county); (Hr'g Tr. 70).

The Jury Department next provides the list of licensed drivers and holders of state-issued ID cards to SDS, with instructions to create the Master Wheel; it is to be filled with actual names of potential jurors. SDS begins by making separate lists of

licensed drivers and state ID holders for each county in the Division.  Next, for each county, SDS merges the three lists (registered voters, licensed drivers, people with state-issued IDs) and eliminates duplicate names.  (Hr'g Tr. 70.)  Finally, SDS selects names at random from the merged list for each county, based on the proportions set forth in the Administrative Order, to create the Master Wheel.  (*Id.*)

In the next step, the Jury Department randomly draws 5,000 names from the Master Wheel and sends juror questionnaires to these people.  *See* Juror Selection Plan § (i)(1) (Clerk of the Court decides how many names are necessary to maintain "an adequate number of names" in the jury wheel).  At this point, questionnaires may fall into one of three categories: (1) "nonresponses," which are questionnaires never returned; (2) "undeliverables," questionnaires returned unopened by the Post Office; and (3) "completed," questionnaires filled out and returned by their intended recipients.

The Jury Department's procedure for following up on undeliverables and nonresponses is limited.  If the Post Office provides a forwarding address for an undeliverable, the Department mails a questionnaire to the new address; if no address is provided, no further action is taken.  (Hr'g Tr. 74.)  The Jury Department also sends follow-up questionnaires to nonresponses; however, there is no standard practice if the second mailing elicits no response.  (*Id.*); Juror Selection Plan § (j).

The Jury Department then processes the completed questionnaires and decides who is not qualified or who should be excused.  Noncitizens, convicted felons, and people who cannot read and write English, among others, are disqualified from jury service under federal law.  Juror Selection Plan § (k); 28 U.S.C. § 1865(b).  Active

6

members of the armed forces, police and fire department members, and certain public officials are also exempt.  Juror Selection Plan § (m); 28 U.S.C. § 1863(b)(6).  The Eastern District also exempts people over 70, firefighters and ambulance crews, and persons who served on a jury within the last two years.  Juror Selection Plan § (l).  Once unqualified and exempt respondents are eliminated, what remains are the completed questionnaires of people who will make up the Detroit Division's Qualified Jury Wheel ("the Qualified Wheel").

In the final step, the Jury Department randomly draws a "jury pool" of about 400 people from the Qualified Wheel.  (Hr'g Tr. 56.)  As they are selected, each person is assigned a number from one to 400; when they are called to service, jurors are called in sequence, starting with the number one.  (*Id.*)  A given jury pool remains on call for two weeks, and its members must be ready to report on a day's notice.  (Hr'g Tr. 52-53.)

Depending on the Court's trial calendar, any number of jury-pool members may be called upon to serve as jurors.  After two weeks, regardless of how many members were summoned, the entire jury pool is retired and a new group of 400 is drawn to form a new jury pool.  As jurors are summoned and pools retired, the Detroit Division's Qualified Wheel is gradually depleted.  To replenish it, the Jury Department draws new names from the Master Wheel and sends out more questionnaires.  Those who are not excused or disqualified join the Qualified Wheel.

Each Master Wheel is kept in service for two years; during that time, the Jury Department draws as many names as the Court's trial schedule demands.  (Hr'g Tr. 48.)  After two years, the Master Wheel is retired, even if some names remain which were never sent questionnaires or selected for placement in the Qualified Wheel.  For

7

example, the 2004-2006 Master Wheel contained 100,000 names, but the Jury

Department mailed only 50,650 questionnaires; the remaining names were not used.

(Gov't Hr'g Ex. B.)  Records relating to old jury pools, Master Wheels and Qualified

Wheels, are kept for a minimum of four years and are available for public inspection.

Juror Selection Plan § (s)(2); 28 U.S.C. § 1868.

### B.    The 2004-2006 Detroit Division Master Jury Wheel

The 2004-2006 Master Wheel was used to create the Qualified Wheel from

which Defendant's jury was drawn.  The Court initiated the creation of this Master

Wheel in February 2004, and ordered that it contain 100,000 names.  E.D. Mich.

Admin. Order No. 04-AO-016 (Feb. 23, 2004).  Based on voter-registration lists, the

Court defined each county's proportion in this Master Wheel: Jackson (3.09%);

Lenawee (1.96%); Macomb (16.22%); Monroe (3.08%); Oakland (25.25%); St. Clair

(3.32%); Sanilac (0.88%); Washtenaw (6.8%); and Wayne (39.4%).  *Id.*  The completed

Master Wheel became effective on October 1, 2004, *id.*, and lasted until September 30,

2006.  *See* E.D. Mich. Admin. Order No. 06-AO-005 (Feb. 22, 2006) (creating the

subsequent, 2006-2008 Master Wheel).

### C.    The Cairo Study

Defendant's factual allegations rest principally on a study of the Detroit Division's

2004-2006 Master Wheel conducted by Anthony Cairo ("the Cairo Study").  After the

Master Wheel was retired and its records became public, Mr. Cairo requested to

conduct a physical examination of all documents pertaining to its creation.  The study

took place in June-July 2008; Mr. Cairo submitted his findings as an exhibit to

8

Defendant's motion to vacate.  (Def.'s Mot. Vacate Ex. B, Affidavit of Anthony E. Cairo, Feb. 26, 2009 [hereinafter Cairo Aff.].)

According to Mr. Cairo, the Jury Department provided him with 37 banker boxes filled with 26,167 juror-qualification questionnaires, and represented that these documents comprised the Detroit Division's Master Wheel for 2004-2006.  (Cairo Aff. ¶ 2; Hr'g Tr. 17-18.)  However, the evidentiary hearing revealed that these records were not Master Wheel records.  (Hr'g Tr. 40, 68.)  Indeed, the Master Wheel contains only names of potential jurors, and no questionnaire is generated for any of them unless they are randomly selected to become part of the Qualified Wheel.  Instead, the 26,167 forms given to Mr. Cairo were an assortment of completed and undeliverable, i.e., returned, questionnaires.  (*Id.*)  Mr. Cairo did not ask for a complete list of names of people who were mailed questionnaires to create the Qualified Wheel, and he was not given information on the number of nonresponses.  (*Id.*)

Defendant's briefs pre-date the evidentiary hearing, and they reflect the Cairo Study's misapprehension that African Americans were underrepresented in the 2004-2006 Master Wheel.  This confusion sprung from Mr. Cairo's belief that the 37 banker boxes provided by the Jury Department comprised the entire 2004-2006 Master Wheel. (S*ee* Cairo Aff. ¶ 2.)  By the time of the hearing, this was no longer Defendant's allegation.  Instead, he now maintains that a disproportionate number of undeliverable questionnaires can be assigned to Wayne County, and that source lists used to create the 2004-2006 Master Wheel were outdated and incomplete.  Defendant contends these defects contributed to lowering the ratio of African Americans in the 2004-2006 Qualified Wheel, and that these problems persist today.

9

Twenty-seven of the boxes provided by the Jury Department were filled with questionnaires completed by people qualified to serve as jurors, organized by date. (Cairo Aff. ¶ 3; Hr'g Tr. 18.)  Two other boxes contained questionnaires from jurors who were excused, and the remaining eight were filled with undeliverables.  (Cairo Aff. ¶¶ 4-5; Hr'g Tr. 22.)  It took 60 hours for an average of three people, working with laptop computers, to sort through all questionnaires.  (Cairo Aff. ¶¶ 1, 8; Hr'g Tr. 17.)

At the evidentiary hearing, it was revealed that the Jury Department failed to provide approximately 10,000 questionnaires to Mr. Cairo, and that the total number of completed and undeliverable questionnaires was actually 36,407, not 26,167.  (Hr'g Tr. 68-69.)  The reasons for this mistake are unclear: according to Ms. Hryshko, the Court's Jury Administrator, the Jury Department was undergoing renovations when Mr. Cairo conducted his study, and several banker boxes may have gotten lost.  (Hr'g Tr. 69.) The current location of these questionnaires is unknown.

Dr. Thomson, the expert statistician, testified that the fact that the Cairo Study does not account for about 10,000 questionnaires is unlikely to undermine Mr. Cairo's findings.  He explained that a random sample of 200 questionnaires would probably be sufficient to decide whether the Detroit Division's Qualified Wheel correctly reflects the proportion of African Americans in the community.  (Hr'g Tr. 84.)  The Cairo Study's sample amounts to nearly three-quarters of returned questionnaires.  According to Dr. Thomson, this is enough to draw reliable conclusions about the Division's Qualified Wheel.  (Hr'g Tr. 83.)  The Court takes the liberty of referring to the Qualified Wheel in its Analysis and Conclusion, because the Cairo Study examined returned questionnaires; once undeliverables and excused jurors are eliminated, what remains is

10

actually the Qualified Wheel.

### D.    Defendant's Findings

According to the United States Census Bureau, African Americans represent about 21.58% of the population in the Detroit Division.  (Def.'s Mot. Vacate Ex. D; Hr'g Tr. 79.)  Census data also indicates that Wayne County has the highest proportion of African-American residents in the Division, roughly 41.8%, compared to 0.4 - 12.5% in the other counties.  (Def.'s Mot. Vacate Ex. C.)  Dr. Thomson testified that, according to the Census, the proportion of African Americans in the Detroit Division remained stable during the 2004-2008 period.  (Hr'g Tr. 80.)

Defendant submits statistical evidence from the Cairo Study and from reports generated by the District's Jury Department, which he claims proves African Americans are underrepresented in Detroit-Division juries.

### 1.    Data from the Cairo Study

The Cairo Study calculates the percentage of questionnaires returned to the Jury Department from each county in the Detroit Division.  (Cairo Aff. ¶ 10, Tables 1, 2; Hr'g Tr. 29-30.)  The results are summarized in Table 1, below.  The first column states the proportion of each county in the 2004-2006 Master Wheel, as set forth in Administrative Order No. 04-AO-016.  The second column lists, for each county, the number of returned questionnaires; the third column sets forth each county's percentage of returned questionnaires.  According to these numbers, Wayne County made up just 29.88% of questionnaires returned.

**Table 1: Cairo Study - Returned Questionnaires and Qualified Jurors, by County**[2]

| County | % Quest. Due as per Admin. Order No. 04-AO-016 | # Quest. Returned | % Quest. Returned | # Jurors Qualified | % Jurors Qualified |
|---|---|---|---|---|---|
| Jackson | 3.09% | 930 | 3.55% | 637 | 3.58% |
| Lenawee | 1.96% | 596 | 2.28% | 411 | 2.31% |
| Macomb | 16.22% | 4,724 | 18.05% | 3,498 | 19.65% |
| Monroe | 3.08% | 903 | 3.45% | 660 | 3.71% |
| Oakland | 25.25% | 7,500 | 28.66% | 5,432 | 30.52% |
| St. Clair | 3.32% | 974 | 3.72% | 715 | 4.02% |
| Sanilac | 0.88% | 222 | 0.85% | 147 | 0.83% |
| Washtenaw | 6.8% | 1,812 | 6.92% | 1,217 | 6.84% |
| Wayne | 39.4% | 7,819 | 29.88% | 5,047 | 28.36% |
| Other | --- | 687 | 2.63% | 34 | 0.19% |
| Total | 100% | 26,167 | 100% | 17,798 | 100% |

The numbers and percentages in columns two and three, respectively, are somewhat misleading; they include undeliverables and questionnaires completed by jurors who were subsequently excused or disqualified.  To determine if Wayne County residents are underrepresented in Division juries, as Defendant asserts, a better number is the proportion of each county in the Qualified Wheel.  Although the Cairo Study breaks down the number of qualified jurors by county (column 4, Table 1), it neglects to state each county's representation in the Qualified Wheel, leaving the Court to calculate the percentages in column 5.  According to these figures, Wayne County

_____

[2] The "Other" category comprises questionnaires sent to counties outside the Detroit Division.  *See* Out-of-Division Mailings, *infra*.

represents only 28.36% of the Qualified Wheel, instead of 39.4%. By contrast, every other county gains in representation, compared to the proportions defined in the Administrative Order.

The Cairo Study also breaks down qualified jurors according to race. As shown in Table 2, African Americans comprised 9.89% of qualified jurors for 2004-2006, even though they formed 21.58% of the Division's overall population. (Cairo Aff. ¶ 11, Table 3; Hr'g Tr. 31.)

**Table 2: Cairo Study - Racial Composition of Qualified Jury Wheel, 2004-2006**[3]

|  | Jurors Qualified | % |
|---|---|---|
| Black | 1,760 | 9.89% |
| White | 14,954 | 84.02% |
| Other | 1,072 | 6.02% |
| Unknown | 12 | 0.07% |
| Total | 17,798 | 100% |

Defendant argues that the underrepresentation of African Americans in the Division's Qualified Wheel is a by-product of Wayne County's underrepresentation among returned questionnaires. Defendant provides several possible explanations for these discrepancies, which are discussed in detail in section III, below.

**2.    Jury Department JMS Reports**

In his Reply in Support of Motion to Vacate (Dkt. #128), Defendant submits seven reports generated by the Jury Department using its Jury Management System

---

[3] The "Other" category includes American Indians, Native Hawaiian or Pacific Islanders, Asians, and persons who identify as Hispanic, Latino, multi-racial or "other."

("JMS") software.  (Def.'s Reply Supp. Mot. Vacate Ex. A; Def.'s Hr'g Ex. 2.)  Among other things, JMS allows the Jury Department to establish the racial composition of a selected group of jurors.  However, JMS is not configured to break down juror information by county.  (Hr'g Tr. 72-73.)

The first JMS report, dated August 15, 2006, analyzes all the people whose names were drawn from the Detroit Division's 2004-2006 Master Wheel and who completed questionnaires.  (Def.'s Reply Supp. Mot. Vacate Ex. A; Def.'s Hr'g Ex. 2.) The results of this report are summarized in Table 3, below.[4]  Of all questionnaire respondents, 8.19% identified as African American.  This is less than the 9.89% observed by Mr. Cairo, *see* Table 2, *supra*, and substantially less than the Division average of 21.58%.  However, 7.58% of respondents did not state a particular race.

**Table 3: JMS Report - Completed Juror Questionnaires by Race, 2004-2006**[5]

|         | Jurors | %      |
|---------|--------|--------|
| Black   | 2,206  | 8.19%  |
| White   | 21,488 | 79.74% |
| Other   | 1,212  | 4.5%   |
| Unknown | 2,042  | 7.58%  |
| Total   | 26,948 | 100%   |

---

[4] The Jury Department's JMS reports account for 10,000 questionnaires Mr. Cairo was unable to inspect (*see* Hr'g Tr. 68-69).  This helps explain the difference between the number of returned questionnaires in the Cairo Study, 26,167 (*see* column 2, Table 1, *supra*), and the number of completed questionnaires in Table 3 (26,948).  In addition, the Cairo Study's 26,167 figure includes undeliverables; Table 3 does not.

[5] The "Other" category includes American Indians, Native Hawaiian or Pacific Islanders, Asians, and persons who identify as multi-racial or "other."  Due to rounding, percentages may not add up to 100%.

14

It is important to note that this JMS report surveys all completed questionnaires (qualified, disqualified and excused).  These numbers cannot be compared directly with the Cairo Study data from Table 2, *supra*, which considers only qualified jurors.  Even so, Dr. Thomson testified that the percentage of African Americans in this report is consistent with the Cairo Study results.  (Hr'g Tr. 78.)

The other JMS reports analyze six jury pools from the 2006-2008 Qualified Wheel, which entered into service after the 2004-2006 wheel was retired.  (Def.'s Reply Supp. Mot. Vacate Ex. A; Def.'s Hr'g Ex. 2.)  In these samples, the percentage of African Americans fluctuates between 8.8% and 12.5%, and the number of jurors of indeterminate race is extremely low.

**Table 4: JMS Report - Jury Pools from the 2006-2008 Qualified Wheel, by Race**[6]

| | Sample Jury Pools from 2006 - 2008 Qualified Wheel | | | | | |
|---|---|---|---|---|---|---|
| | Pool No. 200071002 (Oct. 2007, Pool #2) | | Pool No. 200071201 (Dec. 2007, Pool #1) | | Pool No. 200071202 (Dec. 2007, Pool #2) | |
| Race | Jurors | % | Jurors | % | Jurors | % |
| Black | 37 | 9.25% | 34 | 9.71% | 24 | 9.6% |
| White | 346 | 86.5% | 286 | 81.71% | 208 | 83.2% |
| Other | 14 | 3.5% | 20 | 5.71% | 11 | 4.4% |
| Unknown | 3 | 0.75% | 10 | 2.86% | 7 | 2.8% |
| Total | 400 | 100% | 350 | 100% | 250 | 100% |

| | Pool No. 200080303 (Mar. 2008, Pool #3) | | Pool No. 200080401 (Apr. 2008, Pool #1) | | Pool No. 200070902 (Sept. 2008, Pool #2) | |
|---|---|---|---|---|---|---|
| Race | Jurors | % | Jurors | % | Jurors | % |
| Black | 35 | 10% | 22 | 8.8% | 50 | 12.5% |
| White | 298 | 85.14% | 217 | 86.8% | 329 | 82.25% |
| Other | 12 | 3.43% | 10 | 4% | 17 | 4.25% |
| Unknown | 5 | 1.43% | 1 | 0.4% | 4 | 1% |
| Total | 350 | 100% | 250 | 100% | 400 | 100% |

Since these JMS reports are essentially small samples from the 2006-2008 Qualified Wheel, they are easily juxtaposed with Table 2, *supra*, which is one very large sample from the 2004-2006 Qualified Wheel. Dr. Thomson testified that, together, these JMS reports and the Cairo Study show that African Americans were similarly

---

[6] Each pool number begins with 200, which represents the Detroit Division. The next digits represent the year, the month, and whether the pool was the first, second or third created that month. (Hr'g Tr. 52, 53.) Due to rounding, percentages may not add up to 100%.

underrepresented in the 2004-2006 and 2006-2008 Qualified Wheels.  (Hr'g Tr. 84-86.)

## III.   MERITS OF DEFENDANT'S FAIR CROSS-SECTION CLAIM

Defendant contends that, due to a systematic flaw in the Eastern District of Michigan's Juror Selection Plan, African Americans are consistently underrepresented in Detroit-Division juries, in violation of his constitutional right to be tried by a jury representing a fair cross-section of the community.

### A.   Governing Law: the *Duren* Test

Defendant contends the Cairo Study and Jury Department records provide conclusive evidence that African Americans are systematically excluded by the Eastern District's Juror Selection Plan, in violation of the Sixth Amendment's fair cross-section requirement.  To establish a prima facie fair cross-section claim,

> the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Duren v. Missouri*, 439 U.S. 357, 364 (1979).  "Once the defendant has established a prima facie case, the burden then shifts to the government to show that 'a significant state interest [is] manifestly and primarily advanced by those aspects of the jury selection process . . . that result in the disproportionate exclusion of a distinctive group.'"  *Smith v. Berghuis*, 543 F.3d 326, 336 (6th Cir. 2008) (*quoting Duren*, 439 U.S. at 367-68) (alteration in *Smith*), *reh'g and reh'g en banc denied* (Feb. 9, 2009), *cert. granted*, 130 S. Ct. 48 (Sept. 30, 2009).

To succeed on the third prong of the *Duren* test, it is not necessary to show that

17

the observed underrepresentation is intentional, only that it is systematic.  *Id.* at 339.

Systematic exclusion exists when a large disparity in representation occurs "not just

occasionally," and its cause is "inherent in the particular jury-selection process utilized."

*Duren*, 439 U.S. at 366.

In *Smith v. Berghuis*, an African-American defendant in a criminal case in

Michigan's Kent County Circuit Court challenged his all-white jury on Sixth Amendment

grounds.  543 F.3d at 330.  The defendant claimed that two specific jury-selection

practices caused African Americans to be underrepresented in circuit-court juries.  First,

Kent County allowed prospective jurors with transportation problems, child-care

concerns, or who could not take time away from work, to be excused.  *Id.* at 331.  Since

64% of the county's African-American households were headed by single parents

(compared to 19% for whites), and 31.5% of African Americans lived below the poverty

line (compared to 6.7% of whites), a disproportionate number of excused jurors were

African American.  *Id.* at 333.

Kent County also had a practice of assigning prospective jurors from its largest

city, Grand Rapids, to district courts first; circuit courts received jurors from Grand

Rapids only after district-court venires were filled.  *Id.* at 331-32.  Census data showed

African Americans formed 18.1% of the jury-eligible population in Grand Rapids, but

only 7.8% in the rest of the county; moreover, 85% of Kent County's African-American

residents lived in Grand Rapids, even though the city represented only 37% of the

county's population.  *Id.* at 330.  Therefore, the practice of allocating jurors from Grand

Rapids in priority to district courts concentrated minority jurors in these courts, rendering

18

circuit-court juries unrepresentative by comparison.  *Id.* at 332.

The Sixth Circuit held these practices violated the Sixth Amendment's fair cross-section requirement.  The court stated:

> The introduction of non-random factors into a jury selection process has been found to support an inference of systematic exclusion.  *See, e.g., United States v. Young*, 822 F.2d 1234, 1239 (2d Cir. 1987); *United States v. Osorio*, 801 F. Supp. 966, 978 (D. Conn. 1992).  The lack of random selection in the Kent County jury selection process leads us to conclude that the underrepresentation of African Americans resulted from processes "inherent in the particular jury-selection process utilized."

*Id.* at 341 (*quoting Duren*, 439 U.S. at 366) (footnote omitted).  The court held that Kent County's jury excuse and district court priority assignment practices were "non-random factors" inherent to the jury-selection process which contributed to underrepresenting African Americans in circuit-court juries.  *Id.* at 344.  The Supreme Court granted certiorari in *Smith*, on the issue of how to measure the underrepresentation of very small minorities.

## B.   Analysis

### 1.   First *Duren* Prong: Distinct Group

It is undisputed that African Americans are a "distinctive group" for the purpose of jury-composition challenges.  *Peters v. Kiff*, 407 U.S. 493, 503 (1972); *Jefferson v. Morgan*, 962 F.2d 1185, 1189 (6th Cir. 1992).

### 2.   Second *Duren* Prong: Fair and Reasonable Representation

When assessing whether a distinct group is fairly and reasonably represented, most courts apply the "absolute disparity" standard.  *See United States v. Royal*, 174 F.3d 1, 8-9 (1st Cir. 1999) (discussing cases); *Ford v. Seabold*, 841 F.2d 677, 683-84

(6th Cir. 1988) (using absolute disparity to evaluate underrepresentation of female jurors).  "Absolute disparity measures the difference between the percentage of members of the distinctive group in the relevant population and the percentage of group members on the jury wheel."  *Royal*, 174 F.3d at 6-7.

The Cairo Study indicates an 11.69% absolute disparity between the ratio of African Americans in the Detroit Division (21.58%) and in the Qualified Wheel (9.89%). According to Jury Department figures, African Americans comprised 8.19% of returned and completed questionnaires in 2004-2006, for an absolute disparity of 13.39%.  *See* Table 3, *supra*.  Lastly, in jury pools drawn from the 2006-2008 Master Wheel, the percentage of African Americans varied between 8.8% and 12.5%, i.e., absolute disparities of 12.78% to 9.08%.  *See* Table 4, *supra*.

The law does not define a threshold disparity beyond which discrimination can be presumed.  Some courts rule that disparities below 10% do not raise an inference of discrimination.  *But see United States v. Green*, 389 F. Supp. 2d 29, 55 n.52 (D. Mass. 2005) (describing the 10% rule as "a contrivance . . . based on faulty precedent." (*citing Swain v. Alabama*, 380 U.S. 202, 208-09 (1965))), *rev'd sub nom.*, *In Re United States*, 426 F.3d 1 (1st Cir. 2005).  Others uphold jury-selection plans with disparities in excess of 20%.  *See United States v. Smallwood*, 188 F.3d 905, 914-15 (7th Cir. 1999) (no unconstitutional underrepresentation found, despite 20% absolute disparity); *Ford*, 841 F.2d at 683-84 (same, despite 21.7% and 18.7% disparities in consecutive years).

The disparities observed by Defendant and the Jury Department do not, by themselves, suffice to establish that African Americans are unconstitutionally

20

underrepresented in Detroit-Division jury pools.  However, the Court finds that these disparities are sufficient to raise an inference of discrimination.  *See Jefferson*, 962 F.2d at 1187 (striking down a jury-selection plan with an absolute disparity of 12.6%).

Defendant meets the first two prongs of the *Duren* analysis; however, he is unable to show that the underrepresentation of African Americans in the Division's juries is due to systematic exclusion of this minority group in the jury-selection process.

### 3.      Third *Duren* Prong: Systematic Exclusion

Defendant contends that Wayne County is consistently underrepresented in the Detroit Division's Qualified Wheel, and that, due to this disparity, African Americans are consistently excluded from Division juries.  He advances several reasons for Wayne's underrepresentation, discussed below.

First, however, the Court addresses a claim Defendant made in his motion to vacate, which is based on a faulty premise.  Defendant initially claimed Wayne County was underrepresented because the Jury Department mailed fewer questionnaires to Wayne residents than it should have under Administrative Order No. 04-AO-016.  At the evidentiary hearing, the Government submitted a spreadsheet compiled by the Jury Department on the 2004-2006 Master Wheel.  (Gov't Hr.'g Ex. B.)  In relevant part, this chart documents the number of questionnaires mailed to people selected from the Master Wheel in order to create the Qualified Wheel.  Table 5 breaks down the number and percentage of questionnaires mailed to each of the nine counties in the Detroit Division.

21

**Table 5: Jury Dep't Report - Questionnaires Mailed by County, 2004-2006**[7]

| County | % Quest. Due as per Admin. Order No. 04-AO-016 | # Quest. Due as per Admin. Order No. 04-AO-016 | % Quest. Mailed | # Quest. Mailed |
|---|---|---|---|---|
| Jackson | 3.09% | 3,090 | 3.12% | 1,578 |
| Lenawee | 1.96% | 1,960 | 1.96% | 992 |
| Macomb | 16.22% | 16,220 | 16.18% | 8,195 |
| Monroe | 3.08% | 3,080 | 3.13% | 1,587 |
| Oakland | 25.25% | 25,250 | 25.42% | 12,876 |
| St. Clair | 3.32% | 3,320 | 3.3% | 1,670 |
| Sanilac | 0.88% | 880 | 0.79% | 398 |
| Washtenaw | 6.8% | 6,800 | 6.81% | 3,447 |
| Wayne | 39.4% | 39,400 | 39.3% | 19,907 |
| Total | 100% | 100,000 | 100% | 50,650 |

According to these figures, 50,650 questionnaires were mailed, significantly more than the 26,167 questionnaires counted by the Cairo Study. Moreover, the proportion of questionnaires sent to each county matches almost exactly the ratios set forth in Administrative Order No. 04-AO-016. The likely explanation for Mr. Cairo's error is that he only examined returned questionnaires (both completed and undeliverables), and could not possibly have examined nonresponses. The Jury Department's failure to provide 10,000 additional questionnaires also played a role. Indeed, if one adds up the Cairo Study's 26,167 questionnaires, the 10,000 missing ones, and the 14,243 nonresponses (*see* column 4, Table 7, *infra*), the result, 50,410, is nearly identical to the Jury Department's tally of mailed questionnaires (*see* column 4, Table 5, *supra*). In

---

[7] Due to rounding, percentages may not add up to 100%.

any case, the evidence shows Defendant's allegation, that Wayne County received less than its proper ratio of questionnaires, is unfounded.

In the alternative, Defendant suggests that Wayne County's underrepresentation is due to a combination of other factors. First, Defendant points to data from the Cairo Study which indicates that several hundred questionnaires were mailed outside of the Detroit Division, to counties throughout Michigan. (Cairo Aff. Tables 1, 2; Hr'g Tr. 26-27.) Defendant also claims too many questionnaire recipients were: (1) unqualified due to lack of citizenship, inability to read or speak English, or past criminal convictions; (2) excused for various reasons; or (3) lived outside the Division. (Cairo Aff. ¶ 14, Table 6; Hr'g Tr. 34-36.) Defendant alleges, in particular, that many names in the 2004-2006 Master Wheel belonged to individuals who were deceased, some for over a decade. (Cairo Aff. ¶ 15, Tables 6, 7; Hr'g Tr. 34-36.) Defendant also says that Wayne County has the most undeliverable questionnaires in the Division. (Cairo Aff. ¶ 12, Table 4; Hr'g Tr. 31-32.) Finally, Defendant argues Wayne's underrepresentation is due, in part, to the high number of "nonresponses," questionnaires mailed to addresses in the county, but never returned. Since Mr. Cairo only studied returned questionnaires, whether completed or undeliverable, he has no data on nonresponses.

The Court analyzes whether any of these reasons, if proven, would constitute a non-random factor "inherent in the jury-selection process" resulting in the systematic exclusion of African Americans from Detroit-Division juries. *Smith*, 543 F.3d at 341.

### a.    Out-of-Division Mailings

In the Cairo Study, out of 26,167 questionnaires, 687 were sent to individuals

living in counties outside the Detroit Division.  (Cairo Aff. Tables 1, 2; Hr'g Tr. 26-27.)
Genessee County received 262 questionnaires; Lapeer, Livingston, Saginaw and
Shiawassee received between 20 and 50 questionnaires each.  (*Id.*)  Twenty-two
questionnaires were sent to people living outside the Eastern District of Michigan
altogether.  (*Id.*)  The study does not indicate how many of these 687 questionnaires
were destined for Wayne County, or to other counties in the Detroit Division.

According to Ms. Hryshko, out-of-division mailings usually result from changes of
address by prospective jurors, or from clerical errors by the Jury Department.  (Hr'g Tr.
64-66.)  All questionnaires are initially mailed to addresses inside the Detroit Division.
(*Id.*)  When a questionnaire comes back with a forwarding address in another division,
but still within the Eastern District, it is sent to the new address.  (*Id.*)  If the intended
recipient completes the form and returns it, the Jury Department re-assigns that person
to the correct division.  (*Id.*)  Ms. Hryshko explained that, in some cases, the Jury
Department may have neglected to properly reassign jurors to their new division.  (*Id.*)
Ms. Hryshko also testified that, if a questionnaire has a forwarding address outside the
Eastern District, there should be no second mailing; therefore, the 22 questionnaires
sent to out-of-District addresses resulted from clerical error.  (*Id.*)

Defendant does not suggest that the Court purposefully recruits jurors from
outside the Detroit Division; however, he argues that the erroneous inclusion of jurors,
from out-of-Division counties with low minority rates, dilutes the proportion of African
Americans in Detroit-Division juries.

This allegation does not support Defendant's claim of systematic exclusion.  Of

24

the 687 people who mistakenly received out-of-Division questionnaires, only 34 were qualified. (Cairo Aff. Tables 1, 2.) This represents less than 0.2% of all qualified jurors, too few to meaningfully affect the percentage of African Americans in the Qualified Wheel. Furthermore, according to the Jury Department, out-of-Division residents who respond to jury summonses are turned away, unless they neglect to mention where they live. So, the chance that someone from outside the Division will serve on a jury in the Division is exceedingly small. Moreover, the risk of clerical error exists with any jury-selection procedure, and, therefore, it cannot be deemed "inherent in" a particular plan.

The Court holds that sending jury questionnaires, in error, to individuals living outside the Detroit Division, is not a factor inherent in the jury-selection process, and does not systematically exclude African Americans from jury service.

### b.    Excused, Unqualified, and Dead Jurors

Defendant claims Wayne County and African Americans are underrepresented because too many potential jurors are either unqualified to serve or are excused. According to the Cairo Study, 3,443 questionnaire respondents were either unqualified or excused. Of these, roughly 8.36% were deceased, some for over a decade. (Cairo Aff. Tables 6, 7.) Other common grounds for excuse are: age (55.45%); change of domicile, whether leaving (12.17%), or recently moving to (0.44%), the Eastern District; medical reasons (11.79%); criminal conviction with loss of civil rights (5.52%), or pending criminal charges (0.44%); employment, whether as police officer or firefighter (1.83%), active military (1.02%), or other (0.2%); lack of citizenship (1.22%); and, inability to read, speak or write English (0.64%). (Cairo Aff. Table 6.)

25

Defendant suggests that the District's policy of excusing jurors is partly responsible for Wayne County's underrepresentation.  However, to prevail on this factor, Defendant must show the District's excuse policy is not rational.  In *Smith v. Berghuis*, Kent County had a policy of excusing individuals with transportation or child-care issues, or who could not take time from work.  543 F.3d at 331, 333.  Because minority jurors were disproportionately excused, the Sixth Circuit found the policy was a systematic exclusion inherent in the jury selection process.  *Id.* at 342, 344.  However, the court upheld the practice, stating: "the state has a significant interest [in] avoiding undue burdens on individuals by allowing excuses based on the inability to obtain transportation and 'in assuring that those members of the family responsible for the care of children are available to do so.'"  *Id.* at 345 (*quoting Duren*, 439 U.S. at 370).

The Cairo Study does not break down the number of excused jurors by county, so it is impossible to know if Wayne County residents are disproportionately excused.  The same is true of dead questionnaire recipients: Defendant argues they disproportionately affect Wayne County's representation, but provides no evidence in support.

The number of dead questionnaire recipients suggests that the District's source lists may not be accurate and current.  Contrary to Defendant's suggestion, however, this does not amount to a constitutional violation.  The voter-registration lists, which are used to create the District's jury wheels, are "the presumptive statutory source for potential jurors."  *United States v. Odeneal*, 517 F.3d 406, 412 (6th Cir. 2008) (*citing* 28 U.S.C § 1863(b)).  The District also uses lists of licensed drivers and state ID holders to

26

create jury wheels, in order to recruit from as broad and diverse a population as possible.  These lists are updated every other year by Michigan's Secretary of State.  If these lists are as unreliable as Defendant suggests, the District could research alternatives; however, the mere fact that legitimate source lists contain mistakes, does not violate the fair cross-section requirement of the Sixth Amendment.

The Court holds that the excused, unqualified, and deceased, are not factors inherent in the Juror Selection Plan which systematically exclude African Americans.

### c.   Undeliverables

Defendant claims Wayne County has the highest number of undeliverable questionnaires, and argues this contributes to the underrepresentation of African Americans in the Detroit Division.

The Jury Department keeps a record of undeliverables for each county in the Detroit Division.  These figures were submitted as part of the Government's Hearing Exhibit B, and are reproduced in Table 6, below.  The first column shows the number of questionnaires mailed by county; the second shows how many were returned undeliverable for each county; and, the third indicates each county's share of the total number of undeliverables (e.g., Jackson County: 278 ÷ 9,485 = 2.93%).

27

**Table 6: Jury Dep't Report - Undeliverable Questionnaires, 2004-2006**[8]

| County | # Quest. Mailed | # Quest. Undeliverable | % Total Undeliverable | % Undeliverable per County |
|---|---|---|---|---|
| Jackson | 1,578 | 278 | 2.93% | 17.62% |
| Lenawee | 992 | 187 | 1.97% | 18.85% |
| Macomb | 8,195 | 1,246 | 13.14% | 15.2% |
| Monroe | 1,587 | 260 | 2.74% | 16.38% |
| Oakland | 12,876 | 2,452 | 25.85% | 19.04% |
| St. Clair | 1,670 | 269 | 2.84% | 16.11% |
| Sanilac | 398 | 54 | 0.57% | 13.57% |
| Washtenaw | 3,447 | 995 | 10.49% | 28.87% |
| Wayne | 19,907 | 3,744 | 39.47% | 18.81% |
| Total | 50,650 | 9,485 | 100% | --- |
| Average | --- | --- | --- | 18.27% |

The Jury Department's data indicates that nearly 40% of all undeliverables originate from Wayne County.  Defendant relies on a similar finding in the Cairo Study, which determined that over one-third of undeliverables (33.72%) come from Wayne County.  (Cairo Aff. ¶ 12, Table 4; Hr'g Tr. 32.)

Courts generally hold that undeliverables are not a factor inherent in a particular jury-selection system.  *See, e.g., United States v. Rioux*, 97 F.3d 648, 658 (2d Cir. 1996) ("The inability to serve juror questionnaires because they were returned as undeliverable is not due to the system itself, but to outside forces, such as demographic changes.").  In any case, the data provided by Defendant is inconclusive: since Wayne

---

[8] Due to rounding, percentages may not add up to 100%.

28

is the Division's largest county, the fact that it has the highest number of undeliverables

is unremarkable.  Large counties receive more questionnaires, and would tend to have

more undeliverables.  In fact, each county's position in this list reflects its size; the only

exception is St. Clair, which has the fifth largest population in the Division and places

seventh in undeliverables.

A better approach is to compare the number of undeliverables in a particular

county (column 2, Table 6) to the number of questionnaires mailed in that county

(column 1, Table 6).  The fourth column of Table 6 indicates the rate of undeliverables

per county, as calculated by the Court (e.g., Jackson County: 278 ÷ 1,578 = 17.62%).

These figures show that Wayne County has an undeliverables rate of 18.81%, slightly

higher than average, but lower than Lenawee, Oakland and Washtenaw.  These

numbers do not suggest anything abnormal about the number of undeliverable

questionnaires in Wayne County; instead, Wayne's rate appears to be within the

Division norm.

Since the number of undeliverables is not disproportionately greater in Wayne

County than in the rest of the Division, Defendant fails to show that undeliverables are

an inherent factor in the jury-selection process.

### d.    Nonresponses

Defendant claims that a disproportionate number of questionnaires sent to

Wayne County are never returned.  He argues that high nonresponse rates reduce

Wayne County's representation in the Qualified Wheel, and the proportion of African

American jurors.

As with undeliverables, the Jury Department keeps track of the number of

29

nonresponses for each county in the Division.  (*See* Gov't Hr.'g Ex. B.)  The relevant

numbers are reproduced in Table 7, below.  The first column lists the number of

questionnaires mailed per county.  The second column shows how many were returned

from each county (both completed and undeliverables), and the third calculates each

county's response rate (e.g., Jackson County: 1,250 ÷ 1,578 = 79.21%).  The fourth

column shows how many questionnaires went missing in each county, while the fifth

tracks the nonresponse rate (e.g., Jackson County: 328 ÷ 1,578 = 20.79%).

### Table 7: Jury Dep't Report - Nonresponses by County, 2004-2006[9]

| County | # Quest. Mailed | # Quest. Returned | % Quest. Returned | # Nonresponses | % Nonresponses |
|---|---|---|---|---|---|
| Jackson | 1,578 | 1,250 | 79.21% | 328 | 20.79% |
| Lenawee | 992 | 837 | 84.38% | 155 | 15.63% |
| Macomb | 8,195 | 6,518 | 79.54% | 1,677 | 20.46% |
| Monroe | 1,587 | 1,238 | 78.01% | 349 | 21.99% |
| Oakland | 12,876 | 10,303 | 80.02% | 2,573 | 19.98% |
| St. Clair | 1,670 | 1,350 | 80.84% | 320 | 19.16% |
| Sanilac | 398 | 322 | 80.91% | 76 | 19.1% |
| Washtenaw | 3,447 | 2,800 | 81.23% | 647 | 18.77% |
| Wayne | 19,907 | 11,789 | 59.22% | 8,118 | 40.78% |
| Total | 50,650 | 36,407 | --- | 14,243 | --- |
| Average | --- | --- | 78.15% | --- | 21.85% |

---

[9] Rates of response (column 3) and nonresponse (column 5) are calculated by the Court; the Jury Department does not track these numbers.  Also, Jury Department data accounts for 10,000 questionnaires Mr. Cairo was unable to inspect (*see* Hr'g Tr. 68-69); this is why the total of returned questionnaires in Table 7 (36,407) is so much greater than the Cairo Study's 26,167 figure (*see* column 2, Table 1, *supra*).

When a questionnaire is not returned, the District's policy is to send a follow-up to the same address; if the second mailing goes unanswered, no further action is taken. (Hr'g Tr. 74.)  If all counties have approximately the same rate of nonresponse, the impact on relative representation is negligible.  However, if one county has a much higher nonresponse rate than others, its share of the jury wheel will be proportionately smaller.

Table 7 indicates that Wayne County has a nonresponse rate nearly double the Division average.  As Dr. Thomson testified, this means nonresponses likely account for a considerable share of Wayne County's underrepresentation in the Qualified Wheel. (Hr'g Tr. 94-95.)  Since most of the Division's African-American residents live in Wayne, their representation is correspondingly diminished.  Dr. Thomson agreed with this conclusion, but added he does not believe nonresponses are solely to blame for the underrepresentation of African Americans.  (*Id.*)

Other courts observe this phenomenon, especially in areas with high rates of poverty and/or minority residents.  *See, e.g.*, *Smith*, 543 F.3d at 331 (according to study, areas with large minority populations have the highest nonresponse rates); *Green*, 389 F. Supp. 2d at 62 & n.60, 73 (comparing the average non-response rate of 14 majority African-American towns (16.9%) with that of 21 majority Caucasian towns (7.6%)); *United States v. Purdy*, 946 F. Supp. 1094, 1108 (D. Conn. 1996) (noting that lower voter registration rates, lower questionnaire return rates, and higher disqualification rates may contribute to the underrepresentation of African Americans and Hispanics); *United States v. Murphy*, No. 94 CR 794, 1996 WL 341444, 1996 U.S.

31

Dist. LEXIS 8488, at *12 (N.D. Ill. June 18, 1996) (unpublished) ("The evidence shows that poor African-Americans failed to respond to jury notices at a much higher rate than wealthy whites.").

Courts that have considered whether high nonresponse rates violate defendants' constitutional rights conclude that these are factors external to, and not inherent in, jury selection plans.  *See*, *e.g.*, *Orange*, 447 F.3d at 800 ("Discrepancies resulting from the private choices of potential jurors do not represent the kind of constitutional infirmity contemplated by *Duren*.") (citations omitted); *Rioux*, 97 F.3d at 658 (no systematic exclusion where forces outside the jury-selection system prevent serving juror questionnaires); *Murphy*, 1996 WL 341444, 1996 U.S. Dist. LEXIS 8488, at *12-13 ("The jury selection system . . . is not excluding African-Americans as a group, but many . . . are excluding themselves by not responding to jury questionnaires. . . . [S]uch non-response by African-Americans does not create a constitutional violation by the government."); *United States v. Ortiz*, 897 F. Supp. 199, 205 (E.D. Pa. 1995) (no systematic exclusion of Hispanics where "it was the unfortunate failure of Hispanics either to register to vote or to return the jury questionnaires, through no fault or encouragement of the court . . . , which may have produced any underrepresentation of Hispanics on grand juries.").

Furthermore, "[c]ourts . . . have been relatively uniform in finding that the failure to send additional letters to individuals who did not . . . respond to questionnaires was not 'systematic exclusion' within the meaning of *Duren*."  *Smith*, 543 F.3d at 341 n.5 (*citing Orange*, 447 F.3d at 800).  *See also*, *e.g.*, *United States v. Gometz*, 730 F.2d

475, 481 (7th Cir. 1984) (jury department's failure to follow up on nonresponses is reviewed for abuse of discretion); *United States v. Santos*, 588 F.2d 1300, 1303 (9th Cir. 1979) (failure to follow up on nonresponses does not amount to systemic exclusion); *United States v. Test*, 550 F.2d 577, 586 n.8 (10th Cir. 1976) ("The circuits are in complete agreement that . . . neither the [JSSA] nor the Constitution require[s] that a supplemental source of names be added to voter lists simply because an identifiable group votes in a proportion lower than the rest of the population.") (quotation omitted) (citing cases); *Purdy*, 946 F. Supp. at 1105 (failure to follow up on nonresponses does not violate the JSSA).

The Sixth Circuit has yet to decide whether high nonresponse rates are sufficient to establish systematic exclusion. However, the court is bound by *Duren*'s definition of "systematic": a disparity which occurs more than occasionally and whose cause is *inherent in* the jury-selection process. *Smith*, 543 F.3d at 339 (*citing Duren*, 439 U.S. at 366). Since jury departments have no control over the decisions of private individuals to complete and return juror questionnaires, the Sixth Circuit is unlikely to hold that nonresponses are a factor inherent in the jury-selection process.

The Court holds that, under *Duren*, Wayne County's high nonresponse rate is not a factor inherent in the Juror Selection Plan, even though that high nonresponse rate, and its effects on the representation of African Americans in the Qualified Wheel, are undeniable.

### C.    Conclusion on Merits of Fair Cross-Section Claim

The evidence before the Court indisputably shows that Wayne County residents

33

and African Americans are substantially underrepresented in the Detroit Division's Qualified Wheel.  However, none of the possible explanations for this disparity is a systematic factor inherent in the Eastern District's jury-selection process.  Defendant's fair cross-section claim fails.

## IV.    AFTERWARD: SHORTCOMINGS AND POSSIBLE REMEDIES

The Court could end its analysis here simply by reaffirming the constitutionality of the Eastern District of Michigan's Juror Selection Plan.  However, to do so would be an admission of incapability, or worse, unwillingness to, address factors that contribute to the underrepresentation of African Americans on Eastern-District juries, even though those factors, either alone or in combination, do not rise to the level of a constitutional violation.

In the decade since the current Juror Selection Plan was enacted, courts have had several opportunities to observe the deficit of African Americans and minorities in this Division's juries.  *See, e.g.*, *United States v. Watson*, No. 05-80025, 2008 WL 5235920, 2008 U.S. Dist. LEXIS 101634, at *1, 5-6 (Dec. 15, 2008) (unpublished); *United States v. Fieger*, No. 07-20414, 2008 WL 1902054, 2008 U.S. Dist. LEXIS 34806, at *4-5 (E.D. Mich. Apr. 29, 2008) (unpublished); *United States v. Brown*, 128 F. Supp. 2d 1034, 1037-38 (E.D. Mich. 2001).

Other federal districts have tackled the same dilemma, with minimal success.  As one expert dryly remarked: "Metaphorically speaking, there has to be a statute of limitations on how long a District can lament the undesirability of the underrepresentation of minorities in its jury pools without feeling compelled to act with

34

imagination to do better."  *Green*, 389 F. Supp. 2d at 40 (*quoting* Prof. Jeffrey

Abramson, Report on Defendant's Challenge to the Racial Composition of Jury Pools in

the Eastern Division of the United States District Court for the District of Massachusetts

64-65 (Apr. 22, 2005)).  Where can will and imagination take us?

### A.      Shortcomings of the Juror Selection Plan

The Court uses the term "shortcoming" deliberately, for these are not flaws or

deficiencies of a constitutional nature.[10]  Nevertheless, the Plan's legality cannot

obscure this basic fact: Wayne County residents and African Americans are

consistently and pervasively underrepresented in Detroit-Division juries, from one year,

and one jury wheel, to the next.

The evidence of these shortcomings is clearer and more detailed than ever

before.  It demonstrates an ongoing and persistent trending towards disparity, dating

back to the inception of this Juror Selection Plan.  Revealed by the Cairo Study, the

chronic underrepresentation of Wayne County is confirmed by the Jury Department's

own data, not only for 2004-2006, but for every year since 2000.  Specifically for this

litigation, the Jury Department compiled a series of reports for each county, showing the

number of questionnaires mailed and returned for every Master Wheel since 2000.

Contrary to JMS reports, which are used for day-to-day operations, these reports

cannot be generated with existing software.  (Hr'g Tr. 58-59, 72-73.)  Instead, at the

request of the Court Administrator in preparation for the evidentiary hearing, the Court's

---

[10] As discussed in the October 9 ruling, the question of whether the District's
Juror Selection Plan violates the Jury Selection and Service Act is not before this Court,
as Defendant's claim is time-barred.  *Bates*, 2009 WL 3270190, 2009 U.S. Dist. LEXIS
94415, at *4.

Information Technology Department created a special program to extract data from each Master Wheel and break it down by county.  (Hr'g Tr. 59-60, 72-73, 74.)  The report for the 2004-2006 Master Wheel was admitted at the evidentiary hearing as the Government's Exhibit B.  The other reports were not introduced into evidence, but copies were provided to both parties and to the Court.

These reports are summarized in Table 8, below, and reproduced in full in the Appendix to this Order.  The first column represents the proportion of each county in the Master Wheel, as mandated by the relevant Administrative Order.[11]  The second column tracks the proportional representation of each county among returned questionnaires; the third column tracks the same for qualified jurors.

---

[11] *See* E.D. Mich. Admin. Order Nos.: 00-AO-017 (Mar. 6, 2000); 02-AO-014 (Feb. 8, 2002); 04-AO-016 (Feb. 23, 2004); 06-AO-005 (Feb. 22, 2006); 08-AO-033 (Aug. 5, 2008).

36

**Table 8: Jury Dep't Report - County Representation in Administrative Orders, Returned Questionnaires, and Qualified Jurors, 2000-2010**[12]

| County | 2000 - 2002 Master Wheel | | | 2002 - 2004 Master Wheel | | |
|---|---|---|---|---|---|---|
| | Admin. Order | Returned Quest. | Qualified Jurors | Admin. Order | Returned Quest. | Qualified Jurors |
| Jackson | 3.09% | 3.17% | 3.32% | 3.11% | 3.26% | 3.2% |
| Lenawee | 1.95% | 2.02% | 2.13% | 1.96% | 2.23% | 2.32% |
| Macomb | 15.91% | 18.03% | 19.87% | 15.92% | 17.37% | 19.43% |
| Monroe | 3% | 3.33% | 3.58% | 3.02% | 3.22% | 3.35% |
| Oakland | 25.31% | 27.16% | 27.86% | 25.45% | 27.79% | 28.96% |
| St. Clair | 3.22% | 3.6% | 3.94% | 3.26% | 3.58% | 3.98% |
| Sanilac | 0.92% | 0.95% | 1.07% | 0.9% | 1.07% | 1.06% |
| Washtenaw | 6.63% | 7.81% | 6.42% | 6.82% | 7.55% | 6.19% |
| Wayne | 39.97% | 33.95% | 31.82% | 39.57% | 33.94% | 31.51% |
| Total | 100% | 100% | 100% | 100% | 100% | 100% |

---

[12] The percentages of returned questionnaires for 2004-2006 differ from Cairo Study numbers (*see* column 3, Table 1, *supra*), because Jury Department data accounts for 10,000 questionnaires Mr. Cairo was unable to inspect (*see* Hr'g Tr. 68-69).  Due to rounding, percentages may not add up to 100%.

| County | 2004 - 2006 Master Wheel | | | 2006 - 2008 Master Wheel | | |
|---|---|---|---|---|---|---|
| | Admin. Order | Returned Quest. | Qualified Jurors | Admin. Order | Returned Quest. | Qualified Jurors |
| Jackson | 3.09% | 3.43% | 3.52% | 3.1% | 3.28% | 3.43% |
| Lenawee | 1.96% | 2.3% | 2.34% | 1.94% | 2.13% | 2.36% |
| Macomb | 16.22% | 17.9% | 19.77% | 16.22% | 18.03% | 20.39% |
| Monroe | 3.08% | 3.4% | 3.73% | 3.1% | 3.28% | 3.54% |
| Oakland | 25.25% | 28.3% | 30.37% | 24.8% | 27.52% | 29.72% |
| St. Clair | 3.32% | 3.71% | 3.95% | 3.35% | 3.63% | 4.01% |
| Sanilac | 0.88% | 0.88% | 0.89% | 0.87% | 0.97% | 0.97% |
| Washtenaw | 6.8% | 7.69% | 6.81% | 7% | 7.91% | 6.93% |
| Wayne | 39.4% | 32.38% | 28.63% | 39.62% | 33.26% | 28.64% |
| Total | 100% | 100% | 100% | 100% | 100% | 100% |

| County | 2008 - 2010 Master Wheel | | |
|---|---|---|---|
| | Admin. Order | Returned Quest. | Qualified Jurors |
| Jackson | 3.16% | 3.89% | 3.64% |
| Lenawee | 2% | 2.34% | 2.67% |
| Macomb | 16.77% | 18.25% | 19.68% |
| Monroe | 3.18% | 3.32% | 3.5% |
| Oakland | 25.11% | 28.02% | 29.42% |
| St. Clair | 3.35% | 3.83% | 4.24% |
| Sanilac | 0.87% | 0.97% | 1% |
| Washtenaw | 7.17% | 8.66% | 8.28% |
| Wayne | 38.4% | 30.73% | 27.58% |
| Total | 100% | 100% | 100% |

These numbers show that, year after year, Wayne County's representation erodes progressively from the creation of the Master Wheel to the creation of the Qualified Wheel.  At its lowest, the discrepancy between Wayne's representation in the Master and Qualified Wheels was 8.06%, in 2002-2004; at its highest, in 2006-2008, it was 10.98%.  On average, Wayne lost 9.76% of its share of jurors during this process.

Jury Department records also confirm the Cairo Study's finding that African Americans are chronically underrepresented in the Court's jury pools.  The Cairo Study calculates that only 9.89% of jurors in the Qualified Wheel were African American.  *See* Table 2, *supra*.  The Jury Department does not provide information on the 2004-2006 Qualified Wheel, but its JMS report indicates that only 8.19% of those who returned completed questionnaires were African American.  *See* Table 3, *supra*.  In either case, the results are well below 21.58%, the proportion of the population in the Detroit Division that is African American, according to the U.S. Census.  Furthermore, JMS reports show that African Americans continued to be substantially underrepresented in jury pools during the 2006-2008 time period.  *See* Table 4, *supra*.

Since Wayne County has the highest proportion of African Americans in the Division, logic dictates that if Wayne is underrepresented among qualified jurors, African Americans will be as well.  *See Fieger*, 2008 WL 1902054, 2008 U.S. Dist. LEXIS 34806, at *14-15 (Rosen, J.) ("a substantial under-representation of Wayne County residents is likely to result in an under-representation of African Americans as well.").  Dr. Thomson confirmed that the low ratio of qualified African-American jurors was due, at least in part, to Wayne's underrepresentation in completed questionnaires.

39

(Hr'g Tr. 94-95.)

The evidence before the Court suggests that Wayne County's high nonresponse rate is likely the most important factor contributing to its decline in representation during the jury-selection process. However, other factors probably play a role as well. For instance, Table 8, *supra*, shows that Wayne consistently loses representation in the final stage of jury-wheel creation, when unqualified, exempt, or excused respondents are removed, and the Qualified Wheel is formed. On average, Wayne County loses 3.21% of its representation during this phase; the only other county which consistently declines is Washtenaw, which loses 1% on average.

Nonresponses are not an issue when unqualified, exempt or excused respondents are removed, but other factors may play a role. For example: (1) high rates of criminal prosecutions and convictions, particularly those which result in an automatic and permanent exclusion from jury service under Michigan law, *see* Mich. Comp. Laws § 600.1307a(1)(e); (2) high proportions of immigrants, who may not be American citizens or may lack sufficient understanding of English; (3) lack of childcare services or transportation, *see Smith*, 543 F.3d at 333 (citing expert testimony that childcare and transportation issues disproportionately affect African American communities, and often justify excusing jurors); and (4) lack of access to health care, which increases the likelihood that jurors may be excused for medical reasons. To varying degrees, these factors tend to be more prevalent in poorer or more racially diverse communities and, according to the Cairo Study, they are all common grounds for excusing prospective jurors in the Detroit Division. (*See* Cairo Aff. Table 6.)

40

Unfortunately, the Cairo Study's data on excused and unqualified jurors is not available by county.

The consensus among courts is that, like nonresponses, these factors are usually not inherent to jury-selection plans. Therefore, even if such things as criminal convictions, language barriers, childcare and transportation issues, etc., substantially reduce the presence of minorities in jury pools, this does not amount to systematic exclusion. But, regardless of what causes minorities to be underrepresented, it is a problem which has the potential to seriously undermine the public's perception of, and confidence in, the integrity of the jury system.

Because it affords ordinary citizens the opportunity to participate in the administration of justice, the jury has long been recognized as a pillar of American society. *See* 1 Alexis de Tocqueville, *Democracy in America* 334 (Schocken 1st ed. 1961) ("The institution of the jury raises the people itself, or at least a class of citizens, to the bench of judicial authority [and] invests the people, or that class of citizens, with the direction of society.") (*quoted in Powers v. Ohio*, 499 U.S. 400, 407 (1991)) (alteration in *Powers*). The jury is more than just a component of the judicial apparatus: it represents the impartial administration of justice, and safeguards against the abuse of judicial power. The perception of systematic exclusion, even if unfounded, cannot be ignored, because it weakens the legitimacy of our system of justice.

### B.   Potential Remedies

The dilemma of persistent minority underrepresentation is not specific to the Eastern District of Michigan. At least two other federal courts recently took measures to

41

address this dilemma.

In *United States v. Green*, the court described the erosion of minority representation which occurs in the District of Massachusetts, from the creation of a master wheel to empaneling a jury. 389 F. Supp. 2d at 40-46 (Gertner, J.). The court observed many of the same problems discussed in this opinion, including incomplete or outdated source lists, and high rates of undeliverable and unreturned summonses in minority and low-income counties. *Id.* at 60-62. The court dismissed the defendants' constitutional claims, but held that the district's jury-selection plan violated the Jury Selection and Service Act. *Id.* at 73-74. The court went further, ordering that remedial measures be implemented immediately, including: (1) identifying more accurate source lists; (2) sending a new questionnaire to a randomly-selected person in a given zip code area for every undeliverable form returned from that area; and (3) sending follow-up questionnaires to nonresponders, and, if there continues to be no response, applying the same procedure as for undeliverables. *Id.* at 75-76. The court concluded: "One thing is clear: This Court cannot -- yet again -- return to business as usual and cast a blind eye to real problems with the representation of African-Americans on our juries, and the crisis of legitimacy it creates." *Id.* at 80.

The First Circuit granted mandamus to prevent modifying the jury-selection plan, on grounds that such changes may only be implemented by order of the entire district court. *In Re United States*, 426 F.3d 1, 7-9 (1st Cir. 2005). Nevertheless, in March 2009, the District of Massachusetts approved a new jury-selection plan which requires a new questionnaire to be sent out for each returned undeliverable. U.S. Dist. Ct. for the

Dist. of Mass., *Plan for the Random Selection of Jurors* ¶¶ 5(b), 8 (Mar. 3, 2009), *available at* http://www.mad.uscourts.gov/resources/pdf/RevisedJuryPlan.pdf (last visited Dec. 15, 2009).  *See also Revisions to the Jury Plan for the United States District Court for the District of Massachusetts: Notes of the Jury Plan Committee* (2007), *available at*

http://www.mad.uscourts.gov/general/pdf/a2007/NotesofJuryPlanCommittee.pdf (last visited Dec. 15, 2009).

The new Massachusetts plan has yet to be tested in court; however, since it emphasizes the proportional representation of the district's geographic subdivisions, it is less vulnerable to equal protection challenges.  At least one other federal court followed Massachusetts's lead.  The recently-enacted jury-selection plan of the District of Kansas requires that additional juror-qualification forms be issued, not only for undeliverables, but also for nonresponses, after one follow-up letter.  D. Kan. R. 38.1(g)(2), *in* U.S. Dist. Ct. for the Dist. of Kan., *Rules of Practice* 51 (Mar. 17, 2009), *available at* http://www.ksb.uscourts.gov/images/local_rules/2009_Local_Rules.pdf (last visited Dec. 15, 2009).

The Eastern District of Michigan has all the elements necessary to implement the Massachusetts or Kansas model, and could do so rapidly, at little additional cost. Historically, Master Wheels contain about twice the amount of names necessary to recruit enough qualified jurors over two years.  For example, when the 2004-2006 Master Wheel was retired, it still contained 49,350 unused names, double the 23,728 undeliverables and nonresponses for that period.

43

Other ideas should be considered as well, such as: (1) increasing and enforcing penalties for failing to return juror questionnaires or to appear when summoned; (2) displaying these penalties prominently on juror questionnaire (currently, the forms only state: "If you do not return this questionnaire form, fully completed, within ten days you are liable to be summoned to report at your expense for completion of the questionnaire at this office."); (3) identifying source lists that are more current than, or might compensate for the shortcomings of, existing lists; and (4) performing regular analysis of the proportion of jurors by county, to track the progress of implemented reforms.

Both federal and state courts are implementing some of these reforms.  In New York State, the source lists used to create master wheels include lists of state income-tax filers, and recipients of state unemployment insurance or family assistance. *See* N.Y. State Unified Ct. Sys., *Trial Juror's Handbook* 2 (Spring 2009), *available at* http://www.nyjuror.gov/users/wwwucs/pdfs/hb_Petit.pdf (last visited Dec. 15, 2009). And in January 2009, the Supreme Court of Wisconsin approved recommendations to increase penalties for delinquent jurors, and to incorporate data from alternative source lists when constructing jury wheels.  *See* Wis. Ct. Sys., *Jury Service in Wisconsin* 2, *available at* http://www.wicourts.gov/news/docs/jury.pdf (last visited Dec. 15, 2009). Suggested source lists include: lists of state tax filers; recipients of unemployment compensation; child support payors and payees; and, recipients of approvals or licenses from the Department of Natural Resources.  *Id.*

These are only suggestions for reform.  It may not be necessary to implement all of these ideas to remedy the chronic underrepresentation of minorities in Division juries;

44

other solutions may prove more effective.  However, the evidence is undeniable that compliance with Constitutional standards is not enough to mitigate external factors which can combine to prevent minority and low-income groups from adequate representation on juries.

The need for reform is particularly urgent: in several cases pending in this Court, the Government either intends to seek, or is considering asking for, the death penalty. The right to a representative jury is essential to any defendant, but it is particularly important in capital cases, because the capital jury "renders not simply a factual judgment -- guilt or innocence -- but 'an ethical judgment expressing the conscience of the community.'"  *Green*, 389 F. Supp. 2d at 36-37 (*quoting* Jeffrey Abramson, *Death-Is-Different: Jurisprudence and the Role of the Capital Jury*, 2 Ohio St. J. Crim. L. 117, 119 (2004)) (citation and footnote omitted).  Minority defendants account for a disproportionate number of federal capital prosecutions and death sentences.[13]  At the same time, empirical research suggests that racial composition affects the likelihood

---

[13]  There are 55 federal inmates currently on death row, 33 (or 60%) of which are members of minority groups: 30 African Americans; 22 Caucasians; 2 Latinos; and 1 Native American.  NAACP Legal Defense and Educational Fund, Inc., *Death Row U.S.A.* 66 (Winter 2009), *available at* http://www.naacpldf.org/content/pdf/pubs/drusa/DRUSA_Winter_2009.pdf (last visited Dec. 15, 2009).  According to the Federal Death Penalty Resource Counsel ("FDPRC"), an organization funded by the Office of Defender Services of the Administrative Office of the U.S. Courts, 74% of federal defendants approved for capital prosecution since 1988 are minorities: 238 African Americans (51%); 121 Caucasians (26%); 85 Hispanics (18%); 18 Asian/Indian/Pacific Islander/Native Americans (4%); and 3 Arabs (1%).  FDPRC, *Current Statistics on Use of Federal Death Penalty*, http://www.capdefnet.org/fdprc/pubmenu.aspx?menu_id=94&id=2094 (last visited Dec. 15, 2009).

that a jury will impose the death penalty.[14]  The high stakes and disproportionate impact of capital cases are reason enough to continue the search for ways to elevate minority representation in juries above the constitutional floor.

The Eastern District of Michigan was once a pioneer in exploring ways to promote the proportional representation of minority groups.  In 1992, with the approval of the Sixth Circuit, the District enacted a plan to enforce proportional representation in the Qualified Wheel: if a cognizable group was found to be underrepresented, randomly-selected jurors from other groups were subtracted until the Qualified Wheel reflected a fair cross-section of the community.  The idea was as creative as it was unconstitutional, and, as a result, the Sixth Circuit overturned the plan in *United States v. Ovalle*, 136 F.3d 1092 (6th Cir. 1998).  To promptly comply with *Ovalle* and still maintain a functioning jury-selection system, the District struck down the offending provisions of the plan but kept the rest intact.  In *United States v. Spearman*, the Honorable Eric L. Clay sharply criticized this decision, writing:

> it would seem that the district judges failed in their responsibility to devise a jury selection plan which provides for a fair cross section of the community as applied to all races; instead, they simply did as *Ovalle* instructed[,] . . . thereby leaving a process in place which had been known to result in the inadequate representation of at least one minority group -- African Americans.

186 F.3d 743, 748 (6th Cir. 1999) (Clay, J.).  Coming so soon after *Ovalle*, Judge Clay's appraisal was severe, and perhaps premature.  In the ensuing years, the District took

---

[14] According to one study, "in the absence of black male jurors, death sentences were imposed in 71.9% of the cases, as compared to 42.9% when one black male was on the jury."  Laura G. Dooley, *The Dilution Effect: Federalization, Fair Cross-Sections, and the Concept of Community*, 54 DePaul L. Rev. 79, 108 (2004) (*quoted in Green*, 389 F. Supp. 2d at 41 n.19).

several steps to promote diversity among jurors, instituting a follow-up procedure on

nonresponses, and expanding source lists to reach a broader and more diverse

population.  *Brown*, 128 F. Supp. 2d at 1042.

Despite these efforts, however, racial disparities continue to plague Detroit-

Division juries.  It should not be so.  In *Peters v. Kiff*, Justice Marshall eloquently stated:

> When any large and identifiable segment of the community is excluded
> from jury service, the effect is to remove from the jury room qualities of
> human nature and varieties of human experience, the range of which is
> unknown and perhaps unknowable.  It is not necessary to assume that the
> excluded group will consistently vote as a class in order to conclude . . .
> that its exclusion deprives the jury of a perspective on human events that
> may have unsuspected importance in any case that may be presented.

407 U.S. at 503-04 (Marshall, J.).  The resulting disparities, Justice Marshall added, do

not simply create the *appearance* of bias, but increase the risk of *actual* bias as well.

*Id.* at 503.

A decade after *Ovalle* and *Spearman*, one cannot escape the conclusion that

attempts to increase minority representation in Detroit-Division juries have fallen short

of that laudable goal.  The Eastern District of Michigan is presented with an ongoing

opportunity to express its commitment to ensure that every defendant is judged by a fair

and impartial jury of his or her peers.  This Court is hopeful and optimistic that we will

soon revive and infuse our efforts with renewed will and imagination, and develop a

plan which exceeds the Constitution's minimal requirement to provide a fair cross-

section of the community.

## V.    CONCLUSION

Defendant fails to show that African Americans are systematically excluded from

47

Detroit-Division juries by elements inherent in the Eastern District's Juror Selection

Plan.  Defendant's Motion to Vacate, Set Aside or Correct Sentence is **DENIED**.

      **IT IS ORDERED**.

                                s/Victoria A. Roberts                  
                                Victoria A. Roberts
                                United States District Judge

Dated:  December 15, 2009

<table>
<tr><td>

The undersigned certifies that a copy of this document was served on the attorneys of record by electronic means or U.S. Mail on December 15, 2009.

s/Linda Vertriest
Deputy Clerk

</td></tr>
</table>

48

# APPENDIX

**Jury Department Reports:**
**County Representation in Master and Qualified Wheels**

**Eastern District of Michigan, Detroit Division, 2000-2010**

Wheel 2000A

| County | County Code | # of Names Loaded in Master Wheel (per administrative order) | % of Names Loaded in Master Wheel | # of Questionairres Mailed | % of Questionairres Mailed | # of Questionairres Returned | % of Questionairres Returned |
|---|---|---|---|---|---|---|---|
| Jackson | 75 | 2474 | 3.092 | 1411 | 2.985 | 1086 | 3.169 |
| Lenawee | 91 | 1558 | 1.947 | 876 | 1.853 | 693 | 2.022 |
| Macomb | 99 | 12730 | 15.912 | 7694 | 16.276 | 6178 | 18.028 |
| Monroe | 115 | 2397 | 2.996 | 1460 | 3.089 | 1141 | 3.330 |
| Oakland | 125 | 20250 | 25.312 | 11705 | 24.761 | 9306 | 27.156 |
| St. Clair | 147 | 2576 | 3.220 | 1557 | 3.294 | 1233 | 3.598 |
| Sanilac | 151 | 734 | 0.917 | 408 | 0.863 | 324 | 0.945 |
| Washtenaw | 161 | 5307 | 6.634 | 3224 | 6.820 | 2675 | 7.806 |
| Wayne | 163 | 31975 | 39.968 | 18936 | 40.058 | 11633 | 33.946 |
| Total | | 80001 | 100.000 | 47271.00 | 100.000 | 34269.00 | 100.000 |

2000 - 2002

Wheel 2000A

| # of Questionairres Not Returned | % of Questionairres Not Returned | # of Qualified | % of Qualified | # of Not Qualified | % of Not Qualified | # Undeliverable | % Undeliverable | # of names Remaining in Master Wheel | % of names Remaining in Master Wheel |
|---|---|---|---|---|---|---|---|---|---|
| 328 | 2.495 | 603 | 3.316 | 217 | 3.306 | 266 | 2.794 | 1054 | 3.243 |
| 185 | 1.407 | 388 | 2.134 | 133 | 2.026 | 172 | 1.806 | 680 | 2.093 |
| 1540 | 11.715 | 3612 | 19.865 | 1225 | 18.662 | 1341 | 14.083 | 4994 | 15.368 |
| 324 | 2.465 | 651 | 3.580 | 207 | 3.154 | 283 | 2.972 | 930 | 2.862 |
| 2439 | 18.553 | 5065 | 27.856 | 1705 | 25.975 | 2536 | 26.633 | 8462 | 26.040 |
| 328 | 2.495 | 716 | 3.938 | 231 | 3.519 | 286 | 3.004 | 1014 | 3.120 |
| 86 | 0.654 | 194 | 1.067 | 70 | 1.066 | 60 | 0.630 | 319 | 0.982 |
| 555 | 4.222 | 1168 | 6.424 | 410 | 6.246 | 1097 | 11.521 | 2047 | 6.299 |
| 7361 | 55.994 | 5786 | 31.821 | 2366 | 36.045 | 3481 | 36.557 | 12996 | 39.993 |
| 13146 | 100.000 | 18183 | 100.000 | 6564 | 100.000 | 9522 | 100.000 | 32496 | 100.000 |

*Oakland* (handwritten annotation, row 5)

*Wayne* (handwritten annotation, row 9)

Wheel 2002A

|  | A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|---|
| 1 | *County* | *County Code* | # of Names Loaded in Master Wheel (per administrative order) | % of Names Loaded in Master Wheel | # of Questionairres Mailed | % of Questionairres Mailed | # of Questionairres Returned | % of Questionairres Returned |
| 2 | Jackson | 75 | 3105 | 3.105 | 1647 | 3.010 | 1222 | 3.258 |
| 3 | Lenawee | 91 | 1958 | 1.958 | 1059 | 1.935 | 835 | 2.226 |
| 4 | Macomb | 99 | 15920 | 15.920 | 8696 | 15.892 | 6515 | 17.371 |
| 5 | Monroe | 115 | 3019 | 3.019 | 1652 | 3.019 | 1206 | 3.216 |
| 6 | Oakland | 125 | 25448 | 25.448 | 13869 | 25.346 | 10422 | 27.789 |
| 7 | St. Clair | 147 | 3259 | 3.259 | 1790 | 3.271 | 1343 | 3.581 |
| 8 | Sanilac | 151 | 900 | 0.900 | 508 | 0.928 | 402 | 1.072 |
| 9 | Washtenaw | 161 | 6824 | 6.824 | 3715 | 6.789 | 2830 | 7.546 |
| 10 | Wayne | 163 | 39567 | 39.567 | 21782 | 39.808 | 12729 | 33.940 |
| 11 | Total |  | 100000 | 100.000 | 54718.00 | 100.000 | 37504.00 | 100.000 |

2002 - 2004

Wheel 2002A

| | I | J | K | L | M | N | O | P | Q | R |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | # of Questionairres Not Returned | % of Questionairres Not Returned | # of Qualified | % of Qualified | # of Not Qualified | % of Not Qualified | # Undeliverable | % Undeliverable | # of names Remaining in Master Wheel | % of names Remaining in Master Wheel |
| 2 | 435 | 2.492 | 613 | 3.201 | 291 | 3.757 | 318 | 2.998 | 1436 | 3.191 |
| 3 | 230 | 1.318 | 444 | 2.319 | 191 | 2.466 | 200 | 1.885 | 890 | 1.978 |
| 4 | 2235 | 12.804 | 3721 | 19.431 | 1387 | 17.906 | 1407 | 13.264 | 7164 | 15.922 |
| 5 | 451 | 2.584 | 642 | 3.352 | 276 | 3.563 | 288 | 2.715 | 1360 | 3.023 |
| 6 | 3495 | 20.023 | 5545 | 28.956 | 2022 | 26.104 | 2855 | 26.914 | 11522 | 25.607 |
| 7 | 459 | 2.630 | 762 | 3.979 | 284 | 3.666 | 297 | 2.800 | 1434 | 3.187 |
| 8 | 114 | 0.653 | 203 | 1.060 | 111 | 1.433 | 88 | 0.830 | 377 | 0.838 |
| 9 | 896 | 5.133 | 1185 | 6.188 | 452 | 5.835 | 1193 | 11.246 | 3061 | 6.803 |
| 10 | 9140 | 52.363 | 6035 | 31.514 | 2732 | 35.270 | 3962 | 37.349 | 17751 | 39.451 |
| 11 | 17455 | 100.000 | 19150 | 100.000 | 7746 | 100.000 | 10608 | 100.000 | 44995 | 100.000 |

US District Court - Detroit Division

**Jury Wheel 2004 - 2006**

| | A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|---|
| 1 | *County* | *County Code* | # of Names Loaded in Master Wheel (per administrative order 04-AO-016) | % of Names Loaded in Master Wheel | # of Questionnaires Mailed ol 100600 | % of Questionnaires Mailed %o 50,650 | # of Questionnaires Returned | % of Questionnaires Returned % o 36,407 |
| 2 | Jackson | 75 | 3090 | 3.090 | 1578 | 3.115 | 1250 | 3.433 |
| 3 | Lenawee | 91 | 1960 | 1.960 | 992 | 1.959 | 837 | 2.299 |
| 4 | Macomb | 99 | 16220 | 16.220 | 8195 | 16.180 | 6518 | 17.903 |
| 5 | Monroe | 115 | 3080 | 3.080 | 1587 | 3.133 | 1238 | 3.400 |
| 6 | Oakland | 125 | 25250 | 25.250 | 12876 | 25.422 | 10303 | 28.300 |
| 7 | St. Clair | 147 | 3320 | 3.320 | 1670 | 3.297 | 1350 | 3.708 |
| 8 | Sanilac | 151 | 880 | 0.880 | 398 | 0.786 | 322 | 0.884 |
| 9 | Washtenaw | 161 | 6800 | 6.800 | 3447 | 6.806 | 2800 | 7.691 |
| 10 | Wayne | 163 | 39400 | 39.400 | 19907 | 39.303 | 11789 | 32.381 |
| 11 | Total | | 100000 | 100.000 | 50650.00 | 100.000 | 36407.00 | 100.000 |
| 12 | | | | | | | | |
| 13 | Notes: | | | | | | | |
| 14 | | | | | | | | |
| 15 | 1. Percentages for each county is calculated based on the total number in Columns C, E, G, I, K, M, O & Q, respectively. | | | | | | | |
| 16 | 2. Wheel created on October 1, 2004 and expired on September 30, 2006. | | | | | | | |
| 17 | 3. Number of questionnaires mailed plus names remaining in master wheel (Column E + Column Q) will not equal number of names loaded in | | | | | | | |
| 18 | wheel (Column C). The discrepancy is due to transfers between divisions resulting from jurors moving. The original county code does not | | | | | | | |
| 19 | change. | | | | | | | |
| 20 | 4. Wayne County - Plus/minus percentage between names in master wheel (Column D) and questionnaires mailed (Column F): -.097 | | | | | | | |

2004 - 2006

GOVERNMENT EXHIBIT B   PENGAD-Bayonne, N.J.

Government's Exhibit B

11/12/09 Hearing



**US District Court - Detroit Division**

**Jury Wheel 2004 - 2006**

% of 14,243 (handwritten above column J) · % of 19,094 (above column L) · % of 7,828 (above column N) · % of 9,485 (above column P) · % of 49,400 (handwritten to right of column R)

| | I | J | K | L | M | N | O | P | Q | R |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | # of Questionnaires Not Returned | % of Questionnaires Not Returned | # of Qualified | % of Qualified | # of Not Qualified | % of Not Qualified | # Undeliverable | % Undeliverable | # of names Remaining in Master Wheel | % of names Remaining in Master Wheel |
| 2 | 328 | 2.303 | 672 | 3.519 | 300 | 3.832 | 278 | 2.931 | 1515 | 3.067 |
| 3 | 155 | 1.088 | 446 | 2.336 | 204 | 2.606 | 187 | 1.972 | 965 | 1.953 |
| 4 | 1677 | 11.774 | 3775 | 19.771 | 1497 | 19.124 | 1246 | 13.137 | 8008 | 16.211 |
| 5 | 349 | 2.450 | 712 | 3.729 | 266 | 3.398 | 260 | 2.741 | 1492 | 3.020 |
| 6 | 2573 | 18.065 | 5798 | 30.366 | 2053 | 26.226 | 2452 | 25.851 | 12410 | 25.121 |
| 7 | 320 | 2.247 | 755 | 3.954 | 326 | 4.165 | 269 | 2.836 | 1630 | 3.300 |
| 8 | 76 | 0.534 | 170 | 0.890 | 98 | 1.252 | 54 | 0.569 | 472 | 0.955 |
| 9 | 647 | 4.543 | 1300 | 6.808 | 505 | 6.451 | 995 | 10.490 | 3332 | 6.745 |
| 10 | 8118 | 56.996 | 5466 | 28.627 | 2579 | 32.946 | 3744 | 39.473 | 19576 | 39.628 |
| 11 | 14243 | 100.000 | 19094 | 100.000 | 7828 | 100.000 | 9485 | 100.000 | 49400 | 100.000 |
| 12 | | | | | | | | | | |
| 13 | | | | | | | | | | |
| 14 | | | | | | | | | | |
| 15 | | | | | | | | | | |
| 16 | | | | | | | | | | |
| 17 | | | | | | | | | | |
| 18 | | | | | | | | | | |
| 19 | | | | | | | | | | |
| 20 | | | | | | | | | | |

Wheel 2006A

| | A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|---|
| 1 | County | County Code | # of Names Loaded in Master Wheel (per administrative order) | % of Names Loaded in Master Wheel | # of Questionairres Mailed | % of Questionairres Mailed | # of Questionairres Returned | % of Questionairres Returned |
| 2 | Jackson | 75 | 3100 | 3.100 | 1401 | 3.006 | 1145 | 3.279 |
| 3 | Lenawee | 91 | 1940 | 1.940 | 865 | 1.856 | 744 | 2.131 |
| 4 | Macomb | 99 | 16220 | 16.220 | 7619 | 16.346 | 6295 | 18.030 |
| 5 | Monroe | 115 | 3100 | 3.100 | 1461 | 3.134 | 1146 | 3.282 |
| 6 | Oakland | 125 | 24800 | 24.800 | 11536 | 24.749 | 9607 | 27.515 |
| 7 | St. Clair | 147 | 3350 | 3.350 | 1516 | 3.252 | 1268 | 3.632 |
| 8 | Sanilac | 151 | 870 | 0.870 | 396 | 0.850 | 337 | 0.965 |
| 9 | Washtenaw | 161 | 7000 | 7.000 | 3289 | 7.056 | 2760 | 7.905 |
| 10 | Wayne | 163 | 39620 | 39.620 | 18529 | 39.752 | 11613 | 33.261 |
| 11 | Total | | 100000 | 100.000 | 46612.00 | 100.000 | 34915.00 | 100.000 |

2006 - 2008

Wheel 2006A

| | I | J | K | L | M | N | O | P | Q | R |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | # of Questionaires Not Returned | % of Questionaires Not Returned | # of Qualified | % of Qualified | # of Not Qualified | % of Not Qualified | # Undeliverable | % Undeliverable | # of names Remaining in Master Wheel | % of names Remaining in Master Wheel |
| 2 | 278 | 2.261 | 641 | 3.434 | 318 | 3.541 | 186 | 2.558 | 1663 | 3.17 |
| 3 | 140 | 1.139 | 441 | 2.363 | 189 | 2.105 | 114 | 1.568 | 1052 | 2.00 |
| 4 | 1427 | 11.605 | 3805 | 20.387 | 1633 | 18.185 | 857 | 11.787 | 8440 | 16.08 |
| 5 | 334 | 2.716 | 661 | 3.542 | 296 | 3.296 | 189 | 2.599 | 1615 | 3.08 |
| 6 | 2078 | 16.900 | 5547 | 29.720 | 2509 | 27.940 | 1551 | 21.331 | 13035 | 24.83 |
| 7 | 281 | 2.285 | 749 | 4.013 | 328 | 3.653 | 191 | 2.627 | 1783 | 3.40 |
| 8 | 65 | 0.529 | 181 | 0.970 | 111 | 1.236 | 45 | 0.619 | 457 | 0.87 |
| 9 | 574 | 4.668 | 1294 | 6.933 | 665 | 7.405 | 801 | 11.016 | 3620 | 6.90 |
| 10 | 7119 | 57.897 | 5345 | 28.638 | 2931 | 32.639 | 3337 | 45.895 | 20836 | 39.69 |
| 11 | 12296 | 100.000 | 18664 | 100.000 | 8980 | 100.000 | 7271 | 100.000 | 52501 | 100.00 |

Wheel 2008A

| | A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|---|
| 1 | *County* | *County Code* | # of Names Loaded in Master Wheel (per administrative order) | % of Names Loaded in Master Wheel | # of Questionairres Mailed | % of Questionairres Mailed | # of Questionairres Returned | % of Questionairres Returned |
| 2 | Jackson | 75 | 2209 | 3.156 | 969 | 3.283 | 665 | 3.890 |
| 3 | Lenawee | 91 | 1402 | 2.003 | 585 | 1.982 | 400 | 2.340 |
| 4 | Macomb | 99 | 11737 | 16.766 | 4918 | 16.664 | 3120 | 18.249 |
| 5 | Monroe | 115 | 2224 | 3.177 | 931 | 3.155 | 567 | 3.316 |
| 6 | Oakland | 125 | 17577 | 25.109 | 7314 | 24.782 | 4790 | 28.017 |
| 7 | St. Clair | 147 | 2344 | 3.348 | 978 | 3.314 | 655 | 3.831 |
| 8 | Sanilac | 151 | 612 | 0.874 | 232 | 0.786 | 166 | 0.971 |
| 9 | Washtenaw | 161 | 5017 | 7.167 | 2159 | 7.315 | 1481 | 8.662 |
| 10 | Wayne | 163 | 26882 | 38.401 | 11427 | 38.719 | 5253 | 30.725 |
| 11 | Total | | 70004 | 100.000 | 29513.00 | 100.000 | 17097.00 | 100.000 |

2008-2010

Wheel 2008A

| | I | J | K | L | M | N | O | P | Q | R |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | # of Questionairres Not Returned | % of Questionairres Not Returned | # of Qualified | % of Qualified | # of Not Qualified | % of Not Qualified | # Undeliverable | % Undeliverable | # of names Remaining in Master Wheel | % of names Remaining in Master Wheel |
| 2 | 319 | 2.494 | 349 | 3.636 | 226 | 4.405 | 90 | 3.802 | 1222 | 3.055 |
| 3 | 193 | 1.509 | 256 | 2.667 | 120 | 2.339 | 24 | 1.014 | 803 | 2.007 |
| 4 | 1869 | 14.611 | 1889 | 19.679 | 943 | 18.378 | 288 | 12.167 | 6734 | 16.834 |
| 5 | 373 | 2.916 | 336 | 3.500 | 169 | 3.294 | 62 | 2.619 | 1284 | 3.210 |
| 6 | 2628 | 20.544 | 2824 | 29.420 | 1447 | 28.201 | 519 | 21.926 | 10128 | 25.318 |
| 7 | 339 | 2.650 | 407 | 4.240 | 187 | 3.645 | 61 | 2.577 | 1340 | 3.350 |
| 8 | 73 | 0.571 | 96 | 1.000 | 66 | 1.286 | 4 | 0.169 | 367 | 0.917 |
| 9 | 700 | 5.472 | 795 | 8.282 | 382 | 7.445 | 304 | 12.843 | 2810 | 7.024 |
| 10 | 6298 | 49.234 | 2647 | 27.576 | 1591 | 31.008 | 1015 | 42.881 | 15315 | 38.285 |
| 11 | 12792 | 100.000 | 9599 | 100.000 | 5131 | 100.000 | 2367 | 100.000 | 40003 | 100.000 |